Brown *v.* Lunt.

---

## BROWN *versus* LUNT & *ux.*

By the R. S., c. 91, before a deed can be recorded, it must be acknowledged before a justice of the peace, and his certificate of that fact indorsed thereon.

Without this pre-requisite, the *record* of it is unauthorized, and is *not notice* of a conveyance of the land.

But such *certificate*, if made by a justice of the peace de *facto*, merely, is a sufficient authorization for recording the deed.

Of what constitutes a justice of the peace *de facto*.

The official acts of *such justice*, within the jurisdiction of a justice of the peace *de jure*, are valid, as they affect third parties, and cannot be inquired into collaterally.

Thus a deed duly recorded, bearing the certificate of a justice of the peace *de facto* that it was acknowledged, is valid as a conveyance, both to the parties and the public, although at the *time* of such certificate his commission had expired.

A conveyance made to a married woman, in consideration of her promissory notes, has no validity as to the creditors of the grantor; but if such notes are indorsed by her husband, the deed is valid.

And *such consideration* cannot be impeached, although the indorsement of the notes was *after* the conveyance, if made in pursuance of an agreement when the deed was executed.

*Additional* considerations, when not inconsistent with that expressed in the deed, are provable by parol.

A trust, though secret, is not conclusive evidence of fraud, as to the creditors of either the grantor or grantee. It is open to explanation.

37  423
92  347

37  423
105  236
105  527

Although a party cannot be compelled to execute a *parol* trust, he may do it voluntarily, and his creditors cannot object.

And when a deed, executed in part fulfillment of a parol trust, and in part for a valuable consideration, good upon its face, is attempted to be impeached, parol evidence is admissible to show the real consideration on which it was executed.

*Quere,* if the Act of 1854, c. 68, can operate retrospectively.

All the proceedings in the levy of an execution have reference to the *time when the land was taken.*

And interest on the debt of the judgment creditor can only be computed to that time.

A levy of the debt including the interest on the execution to the time of its completion, which was not till two days *after* the land was taken, cannot be upheld.

ON REPORT from *Nisi Prius,* SHEPLEY, C. J., presiding.

WRIT OF ENTRY demanding a part of the Lunt farm, (so called,) in Westbrook.

The demandant claimed title to the premises by virtue of an attachment, made on May 9, 1851, and a subsequent levy in favor of one Baxter against Abraham W. Whitmore; and by a deed of the same from Baxter to himself.

That judgment was recovered on April 24, 1852, for debt $264,75, and costs $20,63. The levy was completed on May 22, 1852, and the return of the officer on the execution stated, that the land was taken on May 20, the fees of levy were taxed at $15,89, the sum levied being $302,74.

In defence, the tenants put in a deed from Peter Lunt, one of the defendants, to said Whitmore, dated March 1, 1843, conveying the entire farm, and a deed from said Whitmore to Mary S., the wife of said Peter, dated April 3, 1851, of the same farm, and recorded the same day. This deed to Mary, purported to have been acknowledged before Samuel Fessenden, as a justice of the peace. [It also bore another certificate of acknowledgment, before L. Dean a justice of the peace, of Sept. 22, 1853, and was again recorded.]

The demandant called said Fessenden as a witness, who testified, that a year or two before he took the acknowledgment of this deed, his last commission as a justice of the

peace had expired, as he had since ascertained; that he did not know the fact at the time, but acted inadvertently; that he had acted as such justice since 1809, under commissions from Massachusetts and Maine; that he had constantly and frequently acted as such justice, after his last commission had expired, until after he took the acknowledgment, believing that he was a justice of the peace.

He also testified that when the deed was made, Peter Lunt agreed to indorse the notes given by his wife to Whitmore, and it was his impression that he indorsed them at that time.

Plaintiff also called the said Whitmore, who married a daughter of Peter Lunt, and who stated that the consideration of his deed to Mary was her two notes of $1000 each, payable to herself or order, and by her indorsed and delivered to him; that her husband agreed to indorse them at that time, and he thought it was then done, but was not certain. For their security he took a mortgage at the same time, and had since disposed of the notes. A day or two after they were given, he offered them for discount, and they were indorsed by Peter Lunt, but he recollected of no interview with Lunt after they were given and the time of such offer.

The mortgage appeared to be to secure $3000, and Whitmore further testified that the farm at the time of his conveyance was worth from $10 to $12,000; that the $2000, was all he then had against the estate; that he took conveyances of the farm from Lunt and several persons at different times; these conveyances were taken under an agreement with Lunt, that he should take a deed from Lunt of the farm, pay off the incumbrances, and hold it as security. He did relieve Lunt of his embarrassments. It was at that time of much greater value than he paid or expected to pay for it.

He further testified, that when he made the deed to Mrs. Lunt, he was a merchant in good standing, but that in April or May of that year he stopped payment in consequence of the failure of another person; that Mrs. Lunt knew nothing of his situation in business, and that she first proposed that

he should make the conveyance to her; it was not made to affect his creditors or keep his property out of their way. There was some misunderstanding between Lunt and him as to the amount of his claim, but they finally agreed upon $2000 as enough to cover it; the reason why the mortgage was made to secure $3000, was that he wished to obtain a loan of $1000, but no note was ever signed or delivered to him therefor.

The mortgage deed was put into the case by defendant, and also another mortgage from the tenants to Whitmore, to secure $2000, dated Oct. 17, 1851, describing the two $1000, notes of the date of April 3, 1851, as secured thereby.

Demandant also offered a disclosure made by Whitmore, as a poor debtor, on June 15, 1853, for the purpose of showing that he therein stated that the notes of Mrs. Lunt were not indorsed, on the day they were made, by Peter Lunt.

It was also admitted that the tenants had continued to occupy the farm since the conveyance of 1843.

The case was then taken from the jury, by consent of parties, and submitted, upon so much of the testimony as may be legal, to the full Court, with authority to make such inferences, in matters of fact, as a jury might, and render such judgment as the law and rights of the parties may require.

*Fessenden & Deblois, Willis & Fessenden,* and *Shepley & Dana,* for tenants.

*Fessenden & Deblois,* presented an argument in writing upon the point raised, that there was legal fraud.

*G. F. Shepley* and *W. P. Fessenden,* argued the defence orally to the Court.

*Rand,* for the demandant, maintained the following positions : —

1. The deed of April 3, 1851, from Whitmore to Mary S. Lunt, was of no effect *as against creditors* of Whitmore, because it was not duly recorded. It was not duly acknowledged; S. Fessenden was not a justice of the peace. R. S., c. 91, §§ 17, 24, 26.

The registry was illegal, and no rights were obtained under it. 17 Maine, 418; 23 Pick. 80.

There is no pretence of actual notice to us. 29 Maine, 140; 32 Maine, 287.

S. Fessenden was not a *justice de facto.* 5 Wend. 231; 17 Conn. 585; 4 Denio, 168; 3 Camp. 432.

2. The Act of March 31, 1854, is unconstitutional, as it destroys vested rights, and operates retrospectively. 2 Greenl. 275.

3. The deed above referred to is *without consideration* and void as to creditors. The notes of married women are void, and furnish no consideration. 34 Maine, 566.

4. Parol evidence is not admissible to prove any trust or secret agreement. R. S., c. 91, § § 31, 32; 13 Mass. 443; 3 Pick. 205; 19 Pick. 235; 2 Met. 104.

5. A secret trust cannot be executed to the injury of creditors.

HOWARD, J. — These parties derive their respective titles from Whitmore; his title, acquired from Peter Lunt, in 1843, is not in controversy. The demandant claims under an attachment, by a creditor of Whitmore, on May 9, 1851, and a levy of execution in May, 1852. The tenants hold under a deed from Whitmore to Mrs. Lunt, one of the tenants, and the wife of the other, dated, and purporting to have been executed on April 3, 1851. The validity of their title though prior in date to the attachment, is assailed upon the ground, that the deed to Mrs. Lunt, was not so executed and recorded as to pass the estate, and stand against the subsequently acquired title of the demandant; and, that if, duly executed and recorded, yet that it was without consideration, and void as against the creditors of Whitmore. The tenants, in turn, contend, that the levy through which the demandant claims, was defective and void.

The objection taken to the execution of the deed to Mrs. Lunt, is, that the certificate of acknowledgment, was not

made by a person authorized to make it, or to take the ac-
knowledgment of deeds, and that it was, therefore, inoper-
ative, and did not authorize the deed to be recorded.   R.
S., c. 91, § § 1, 17, 24, 26.   The conclusion will follow if
the objection be sustained.   For such a record would not
afford constructive notice to the attaching creditor, and his
title would take precedence.  *De Witt* v. *Moulton*, 17 Maine,
418.   Since actual notice to him, of the prior conveyance
is not proved, nor can it be fairly presumed from the evi-
dence reported.

It appears, that the magistrate who made the certificate,
was not in commission at the time.   Being called as a wit-
ness, by the demandant, at the trial, he testified, " that he
had no doubt, that the commission which he held as a jus-
tice of the peace, had expired before he took the acknow-
ledgment of that deed."   And on cross-examination he tes-
tified, " that he had acted as a justice of the peace ever since
the year 1809, by commissions under Massachusetts and
Maine; that a year or two before he took the acknowledg-
ment of this deed, his last commission had expired, as he
had since ascertained; that he did not know the fact at the
time, acted inadvertently; that he had constantly and fre-
quently acted as a justice of the peace, after his commis-
sion expired, until after he took the acknowledgment, be-
lieving that he was a justice of the peace; and that the
parties to the deed well knew that he so acted."

It is plain, that he was not then a justice of the peace *de*
*jure.*   Was he such *de facto,* and can his acts in question
be sustained ?

" An officer *de facto,* is one who has the reputation of
being the officer he assumes to be, and yet is not a good
officer in point of law."   *Parker* v. *Kett,* 1 Ld. Raym. 658 ;
*The King* v. *The Corporation of Bedford Level,* 6 East,
368.   Or one who actually performs the duties of an
office, with apparent right, and under claim and color of an
appointment, or election.   He is not an officer *de jure* be-
cause not in all respects qualified and authorized to exer-

cise the office; nor an usurper who presumes to act officially, without any just pretence or color of right. A mere claim to be a public officer, and exercising the office, will not constitute one an officer *de facto;* there must be, at least, a fair color of right; or an acquiescence by the public in his official acts so long that he may be presumed to act as an officer by right of appointment or election. *The King* v. *Lisle,* 2 Str. 1090; *Wilcox* v. *Smith,* 5 Wend. 231; *Plymouth* v. *Painter,* 17 Conn. 588; *Baird* v. *The Bank of Washington* 11 Serg. & Rawle, 411.

The distinction between officers *de facto,* acting *colore officii,* and officers *de jure,* has been recognized in England from an early period, and seems to have been applied to officers of every grade, from the King to the lowest incumbent of office. In statute of Edw. 4, c. 1, Henry, 4, 5, and 6, were styled "late Kings of England successively, in *dede* and *not of ryght."* And in charters granted by King Edw. 4, he describes the line of Lancaster, as *" nuper de facto, et non de jure, reges Angliæ."* Henry 6, was regarded as King *de facto,* although he had been declared an usurper by Act of Parliament; and treasons against him were punishable as capital offences, during the reign of his successor. 1 Bla. Com. 204, 371; 1 Hale, P. C. 60, 61; Foster, 397, 398.

The same distinction has been made in the Courts of England, in respect to the office of an Abbot, (L'Abbe De Fontein's) Year Book, 9 Henry 6, 33; of a Bishop, and of a Steward of a manor, *Harris* v. *Jays,* Cro. Eliz. 699; *Parker* v. *Kett,* 1 Ld. Raym. 660; of a mayor, *Knight* v. *The Corporation of Wells,* Lutw. 580; *The King* v. *Lisle,* 2 Str. 1090; of a deputy collector of customs, *Leach* v. *Howell,* Cro. Eliz. 533; of a Registrar of a corporation, *The King* v. *The Corporation of Bedford Level,* 6 East, 368; and of a justice of the peace, who had not taken the oath of office, before assuming its duties, *Proprietors of Margate Pier* v. *Haunam,* 3 B. & A. 266; and his acts were held valid, although he had not complied with the require-

ments of the statute, (Geo. 2, c. 20,) in taking the oath of qualification; on the ground that the interest of the public at large, required that the acts done should be sustained, ABBOTT, C. J., remarking, that "many persons, acting as justices of the peace in virtue of offices in corporations, have been ousted of their offices from some defect in their election or appointment; and although all acts, properly corporate and official, done by such persons, are void, yet acts done by them as justices, or in a judicial character, have in no instance been thought invalid. This distinction is well known.

The same distinction is equally well known in this country, and has been applied in numerous cases, and to a great variety of offices, where persons have claimed to act *colore officii*, though not qualified according to the requirements of law, and where their acts, as officers *de facto*, have been upheld. It is familiar doctrine in the Courts of our own State, and is sustained by the cases following. *Fowler* v. *Bebee*, 9 Mass. 231; *Nason* v. *Dillingham*, 15 Mass. 170; *Bucknam* v. *Ruggles*, 15 Mass. 180; *Commonwealth* v. *Kirby*, 2 Cush. 577; *Plymouth* v. *Painter*, 17 Conn. 585, where it was held that a grand juror, though legally disqualified by a refusal to take the requisite oath, might be regarded as an officer *de facto*. *Smith* v. *State*, 19 Conn. 493; *The People* v. *Collins*, 7 Johns. 549; *McInstry* v. *Tanner*, 9 Johns. 135; *Trustees of Vernon Society* v. *Hills*, 6 Cow. 23; *Wilcox* v. *Smith*, 5 Wend. 231; *The People* v. *Bartlett & als.* 6 Wend. 422, in which case it was held that the trustees of a village, holding over beyond the term for which they were elected, by their own neglect, were liable to be ousted on *quo warranto*; but that they were officers *de facto*; that their acts for certain purposes were valid, and that their title to the office could not be inquired into collaterally. *The People* v. *White*, 24 Wend. 527; *The People* v. *Covert*, 1 Hill, 674; *The People* v. *Stevens*, 5 Hill, 616, 630, 631; *The People* v. *Hopson*, 1 Denio, 574; *Greenleaf* v. *Low*, 4 Denio, 168; *McGregor* v. *Balch*, 14

Vermont, 428; *Moore* v. *Graves*, 3 N. H. 408; *Tucker* v. *Aiken*, 7 N. H. 113, where the rule was held to be applicable to town officers; *Cocke* v. *Halsey*, 16 Peters, 81; *Allen* v. *McKeen*, 1 Sumner, 312.

Without further reference to cases, it will be found that the distinction stated is fully sustained by those already cited; and that it applies to all public officers, judicial or ministerial, whether claiming by election or appointment; and whether holding under a defective title within the term, or in possession, and exercising the office under color of right, beyond the term affixed to it by law. Though at the expiration of his commission, an officer may be disqualified from acting officially, yet it may not be so plain and obvious as to deprive him of an apparent right to exercise the office. Others are not required to ascertain at their peril, whether he is legally qualified, before yielding to his authority, or calling upon him to perform official acts, proper and necessary to be done. They are not obliged to demand or test his authority, or to ascertain the date or duration of his commission; nor is there a necessity upon him, ordinarily, to proclaim or exhibit the tenure or character of his official authority. An under steward, holding over after the death of the chief steward, having a colorable right, was held to be so far rightfully in place and power, until the death of his principal was known, that his acts were regarded as those of an officer *de. facto.* 6 East, 369, before cited, where L'd ELLENBOROUGH refers to one of the earliest cases, (*Knowles* v. *Luce*, Moore, 109,—112,) to be found in the books, to the point under consideration. *Crew* v. *Vernon*, 3 Cro. Car. 97, 98.

In this case, as it appears by the report, the magistrate whose official character and authority is in question, had been an acting justice of the peace, " constantly and frequently," for forty years successively, under commission, and qualified as we must understand; and was well known, as such officer, to the parties to the deed, and consequently, from the nature of his official acts and duties, was well known to the public.

He was not an intruder, and did not usurp the office; but was in by appointment, and acting with color of title, though holding over the time limited by his commission, and without legal authority. He had been admitted to the legal possession and enjoyment of the office, by taking the requisite oath of qualification, as seems to be conceded. 1 Str. 538; *Rex* v. *Ellis,* 9 East, 252, note. The acts in question were within the jurisdiction of a justice of the peace, and among the ordinary duties of such officers. It does not appear that his official character had ever been questioned. And, while it must be admitted that there may be cases, in which it might be difficult to determine whether a person exercised a particular office by color of right, or as a mere usurper, yet this, in our opinion, is not one of that character. Here the evidence justifies and requires the conclusion that the magistrate appeared to have had a right, and colorable title to the office which he assumed to exercise, when he took the acknowledgment, and made, upon the deed, the certificate in question. He being in reputed authority, as a magistrate of long standing, third persons requiring his official services, were not bound to ascertain whether, or not, he had a commission in force; nor are they chargeable with notice of the date or termination of his commission. It is not reasonable to suppose, that he would put the parties, or the public, on the inquiry into his official authority, so long as he was exercising the office, "believing that he was a justice of the peace," as he testified. The case shows, that neither the magistrate, nor the parties to the deed, nor the public, by fair presumption, knew or supposed, that his commission had expired. He had been duly accredited by the government, and was assuming to act in his official capacity, as of right, and with, at least, a colorable right; and the public, and third persons, might well regard him as continuing in authority, until it became apparent, that his official character was lost or changed. He must be regarded, therefore, as a justice of the peace *de facto,* when he took and certified the acknowledgment of the deed to Mrs. Lunt.

" The law is too well settled to be discussed," as stated by Chancelor KENT, in *People* v. *Collins,* and shown by the authorities cited, that the acts of an officer *de facto,* done by virtue of his office, are as valid, so far as the rights of the public and third persons who have an interest in the acts, are concerned, as if he were an officer *de jure;* and it is as well settled, that neither his title to the office, nor his official acts, can be indirectly called in question, in a suit to which he is not a party. His office and authority may be valid as to others, though invalid as to himself. These doctrines are held to be founded in public policy and convenience, and necessary to the maintenance of the supremacy and execution of the laws, and for the protection and security of individual rights. Hence the law favors the official acts of those in reputed authority; and the rights of those claiming title or interest through their proceedings. 16 Vin. Abr. 114, [Officer and Offices, G. 3, G. 4.]

The certificate of acknowledgment of the deed to Mrs. Lunt, having been made by a justice of the peace *de facto,* was valid, as to the parties to the deed and the public; and it authorized the registry of the instrument upon the public records of deeds. Such registry would constitute public, legal notice to all persons, of the conveyance.

But it is urged, that the conveyance was without consideration, and void as to the creditors of Whitmore. The deed is good upon its face, but the demandant relies upon the testimony of Whitmore, whom he called as a witness, to support this objection. The tenants rely upon the testimony of the same witness, as furnishing evidence to meet the objection, and repel all presumptions of fraud.

The notes of the grantee, for two thousand dollars, she being a married woman, would, of themselves simply, furnish no consideration for the conveyance; but being indorsed by the husband, in pursuance of his agreement at the time, his liability was secured upon the notes, and they thereby constitute a valuable consideration. Whether he indorsed at the time, as the evidence tends very strongly to show, or

" within a day or two after they were given," in fulfillment of his agreement made at the time, would make no difference in this case, as to his liability, or the validity of the consideration furnished.

The estate, or farm, as it is called, was proved and admitted to be of much greater value than the amount paid or secured by the notes. But the tenants proved by the plaintiff's witness, Whitmore, on cross-examination, that there were additional and other considerations than those named in his deed, for the conveyance; such as that he took the conveyance from Peter Lunt, who was his father-in-law, in 1843, to remove the incumbrances then upon it, in order to relieve the grantor from embarrassments, and that he held the farm by agreement as security; that there was some misunderstanding between him and Lunt, as to the amount of his claim in 1851, but that they finally agreed upon two thousand dollars, as an amount sufficient to cover his claims, and that upon receiving the notes before mentioned, for that sum, he conveyed the premises to Mrs. Lunt, and that the tenants had continued to occupy the farm since the conveyance in 1843.

It was competent for the tenants to aver and prove additional considerations not expressed in the deed, and not inconsistent with that expressed. The cases cited are full to this point. *Tyler* v. *Carleton*, 7 Maine, 175, and the cases there referred to; *Emmons* v. *Littlefield*, 13 Maine, 233; *McCrea* v. *Purmort* 16 Wend. 665; *Wallis* v. *Wallis*, 4 Mass. 135; *Quarles* v. *Quarles*, 4 Mass. 682.

But it is contended that, as all trusts, in this State, concerning lands, except those which arise or result by implication of law, must be created and manifested by writing, parol evidence was not admissible to prove any supposed trust, or secret agreement between Peter Lunt and Whitmore. R. S., c. 91, §§ 31, 32. A party might not be compelled to execute any such trust, nor could it be enforced, unless manifested and created, as required by statute. Yet a parol trust may exist, and may be executed voluntarily, and the

existence of such a trust may be established, and ordinarily must be proved by parol evidence.

One may, if he will, do that which the law will not compel him to do, and those whose rights or interests are not thereby affected injuriously have no cause to complain. Here the conveyance was not in trust for the debtor, but in execution, in part, at least, of a trust reposed in him by his grantor. That trust, though secret, would not be conclusive evidence of fraud, against the creditors of the grantor, and still less, as to creditors of the grantee.

The burden of proof is on him who alleges the want of consideration, or fraud, in a conveyance good upon its face. Here a valuable consideration is shown by the testimony offered by the demandant, and the evidence does not establish fraud in the reconveyance of the farm to the wife of the grantor of the debtor. But, on the contrary, the debtor, when called as a witness by the demandant, testified, "I was a merchant in this ·city, (Portland,) in 1851, in good standing when I made the deed to Mrs. Lunt; I stopped payment some time in April or May, 1851; neither Mr. nor Mrs. Lunt knew any thing of my situation in business matters; Mrs. Lunt first proposed that I should convey to her; that conveyance was ·not made to affect my creditors, or keep my property out of their way." This testimony was not contradicted, nor assailed, excepting by a disclosure of the witness, offered to show that he had therein stated, that the notes referred to were not indorsed by Peter Lunt on the day they were made; and it stands alone and uncontrolled by any facts or evidence in the case.

The case, *Smith* v. *Lane*, 3 Pick. 205, was regarded as one where the conveyance was fraudulent, and apparently was not very fully considered; and it does not appear to have been subsequently regarded as authority to the full extent, in more recent decisions by the same Court. *Cutler* v. *Dickinson*, 8 Pick. 386; *Oriental Bank* v. *Haskins*, 3 Met. 332. In *Flint* v. *Sheldon*, 13 Mass. the tenant undertook to prove by parol a secret trust, to ·control and

defeat his own deed, but the evidence was rejected. *Somes* v. *Brewer*, 2 Pick. 184, is different from this in the facts and principles involved. In *Parkman* v. *Welch*, 19 Pick. 231, 236, the conveyance was held to be clearly fraudulent and void in law.

In the case at bar, we cannot conclude from the evidence, that the conveyance under which the tenants hold, was either voluntary or fraudulent. Roberts, Statute of Frauds, 15, 66, 72, 73.

The statute of 1854, c. 68, making valid the acknowledgment of deeds, in certain cases, is supposed to have reference to this case; but its construction is not required at this time, as it cannot be material to the result of our deliberations.

The objection to the levy involves a question of practical importance, that may frequently arise, and its consideration at this time may be appropriate. The levy was completed on May 22, 1852. The officer returns, "By virtue of this execution, on the 20th inst. I took the parcel of real estate described in the above certificate of the appraisers, and on the 22nd inst. I extended this execution thereon in manner following," &c. The R. S., c. 94, § § 1, 2, provide that certain descriptions of real estate of a debtor may be "*taken in execution* for his debts.*" In § 4, the manner of selecting appraisers, their qualification and duties are described. In § 5, it is provided that, "after the officer *has taken land in execution,* and given notice to the debtor thereof, and allowed him a reasonable specified time, within which to appoint an appraiser, as mentioned in the preceding section, he shall then proceed, without unnecessary delay, to have the estate appraised, and the levy completed; *and it shall be considered as made when the land is taken in execution;* and the subsequent proceedings and return shall be valid, though made and done after the return day, or after the removal or other disability of the officer." He is required to state in his return on the execution certain

facts, and among them, and *first,* "the time when the land *was taken in execution.*"    (§ 24.)

As all subsequent proceedings are thus made by statute to relate to the time when the land is *taken in execution,* the amount for which the creditor can take the debtor's land by levy of execution, must be the amount only that is due and collectable at that time.    Interest upon the judgment should not be reckoned and included beyond that time, as the officer can *take in execution* land of the debtor only for his debt then due.    Subsequently accruing interest could not, in any just sense, be regarded as then due, or as forming a part of the debt then existing.

It had been decided, before the enactment of the Revised Statutes, that the whole proceedings of the seizure of land on execution, and completing the extent, have relation to the day of the seizure.    *Heywood* v *Hildreth,* 9 Mass. 393 ; *Brown* v. *Maine Bank,* 11 Mass. 133 ; *Waterhouse* v. *Waite,* 11 Mass. 207 ; *Cushing* v. *Arnold,* 9 Met. 26.    But in *Allen* v. *The Portland Stage Company,* 8 Maine, 207, it was held that the levy of an execution on real estate could not be considered as commenced until the appraisers were sworn.    In *Eveleth* v *Little,* 16 Maine, 374, in equity, it appeared that the appraisers were selected and sworn on April 11, but that the appraisement was made, the extent completed and seizin given at an adjournment of the proceedings on the twenty-ninth of the same month ; and the Court held that the time for redemption did not expire until a year from the completion of the levy.    The statute then in force, (1821, c. 60, § 30,) authorized a redemption by the "debtor, his heirs or assigns, executors or administrators, within the space of one year next following the extending execution thereon."    But the Revised Statutes furnish the rule for this case, and as it appears that the sum for which the debtor's land was appraised and set off on execution, included interest on the judgment, to the time when the extent was completed, and for two days after the land was "*taken in execu-*

*tion,"* the levy is invalid. It falls within the decision in *Glidden* v *Chase,* 35 Maine, 90.

*Demandant nonsuit.*

SHEPLEY, C. J., and RICE, HATHAWAY and CUTTING, J. J., concurred.