## Israel E. Carleton v. The People.

A county may be created and have existence as such, notwithstanding it has no county officers. Per MARTIN CH. J.

And where a new county is created by setting off for that purpose organized townships from existing counties, the supervisors of these townships are thenceforth supervisors of the new county, their powers being conferred and duties imposed by the general laws of the State, instead of by the act creating the new county. Per MARTIN CH. J. and MANNING J.

It is not absolutely necessary to the existence of a County Board of Supervisors that there be a person authorized to perform the duties of County Clerk. The Board is a constitutional body, and if there be no County Clerk, it may appoint a person to act as its clerk, so as to enable it to proceed to the discharge of its duties. Per MARTIN CH. J.

A county was organized by setting off certain townships from existing counties. The act for that purpose was passed February 4th, 1859, and provided for an election of county officers "at the annual township election to be held in April *next*," which officers were to enter upon the discharge of their duties "on the first day of June *next*." But the act not having been ordered to take immediate effect, did not take effect under the Constitution until May 16th, 1859. An election was nevertheless held for county officers in April, 1859, and the persons who were chosen qualified and entered upon the discharge of the duties of county officers at the time specified.

*Held* per MARTIN CH. J. and MANNING J. that whether this election was lawful or not, these persons were officers *de facto*, and the legality of their tenure of office could only be questioned in a direct proceeding for that purpose, to which they were parties. Where there is an office, all that is required to make an officer *de facto* is that the individual claiming the office be in possession of it, performing its duties, and claiming to be such officer under color of an election or appointment, as the case may be.

But per CAMPBELL J., CHRISTIANCY J. concurring, there can be no officer *de facto* where no officer *de jure* is provided for. To give the law any force it must be held to apply to the annual election next after it took effect, and prior to that time the law would negative the idea that there could be lawful incumbents of the county offices.

*Heard November 14th 1861. Decided May 30th.*

Error to Muskegon Circuit.

*E. C. Walker* for plaintiff in error.

*C. Upson, Attorney General,* for the People.

CARLETON v. THE PEOPLE.

MARTIN CH. J.:

Carelton was elected supervisor of the township of Oceana, at the township election held in April, 1859, and duly qualified as such. His township at that time was in the county of Oceana. By an act of the Legislature, approved February 4, 1859, the county of Muskegon was organized from territory which at the time was included within the limits of Oceana and Ottawa counties, and within this territory was the township of Oceana. The information charges Carelton with willfully neglecting to produce the assessment roll of his township, for examination and equalization, to the Board of Supervisors of Muskegon county, at its annual meeting in October of that year. It is found by the special verdict, that at the time of the alleged neglect Carleton was supervisor of the township of Oceana; that he did refuse to present the assessment roll of his township "to a body of men calling themselves and assuming to act as the Board of Supervisors of the county of Muskegon; that such body of men, being composed of the supervisors of the several townships embraced within the county of Muskegon, claim to act and be a legal Board of Supervisors under and by virtue of the act approved February 4, 1859, and that in accordance with the provisions of the said act, county officers for said Muskegon county were elected and qualified in April, 1859, and entered upon the discharge of their duties, and still continue to act as such, and that no other or different county officers have at any other time been elected or assumed to act."

Carleton sets up by way of defense, and as ground of error, that he was not bound to present the assessment roll of his township to the body acting as the Board of Supervisors of Muskegon county, because the act of February 4th was unconstitutional, and there was therefore no such county: 1st, because, as he alleges, by such act so many townships are taken away from the counties of Ottawa and Oceana, as to leave in neither of them "the

number secured by the Constitution;" and, 2d, because the fourth section of the act provides for the election of officers prior to the day when the act could constitutionally take effect.

The first ground of defense has been held invalid by us in *Rice v. Ruddiman* [*ante*], and for reasons in which I fully concur; and it only remains to consider the second.

The fourth section, which provides for the election of county officers, is claimed to be vital to the whole act, so that if unconstitutional it will destroy the act.

The section is as follows: "At the annual township election to be held in April next, the proper county officers for said county shall be elected, whose terms of office shall expire on the first day of January, 1861, and when their successors are elected and qualified: said officers, on or before the first of June next, shall take and subscribe the oath of office prescribed," &c., "and shall have and possess all the powers and discharge all the duties conferred upon, or required of county officers in this state, and shall enter upon the discharge of such duties on the first day of June aforesaid." The Constitution provides that no public act shall take effect or be in force, until the expiration of ninety days from the end of the session at which it was passed, unless the Legislature shall otherwise direct by a two-thirds vote of the members elected to each house. This direction does not appear to have been given in respect to the act in question, and the ninety days expired about the middle of May, more than a month after the election of county officers under section four was held.

The special verdict finds, that an election, in April, 1859, of county officers, was had, and was so had in accordance with the provisions of the act. That such officers were elected was a question of fact, proper for the jury to find; but whether the election was in accordance with the provisions of the act, or not, was a question of law, belonging

to the Court alone. I have no doubt, however, that such election was in accordance with such provisions; for the language of section four imports an intention, upon the part of the Legislature, that the new county should be fully organized, and go into active political existence upon the first day of June, 1859, as that would be the first of June next after the act took effect; while it would be absolutely erected, and its territory severed from the counties out of which it was carved, at the time the act took effect, viz: at the expiration of ninety days after the close of the session at which it was passed, which was about the 16th of May. But although an election of county officers in April, 1859, under this section, may have been unconstitutional, yet the section was not so vital to the whole act, as to render the whole unconstitutional. The election of county officers was not a pre-requisite to the creation of the county; for, by the very terms of the act, such county became a body corporate and politic long before the officers thus to be elected could enter upon their duties; and such creation was not dependent upon their election and qualification. If the election could not constitutionally have been held until the spring of 1860, yet the territory of the county of Muskegon was completely and effectually severed from Ottawa and Oceana on the day the act took effect. I therefore hold the law organizing the county to be constitutional, so far as the separation of such territory is concerned. *Vide Commonwealth v. Fowler*, 10 *Mass.* 291. In the new county were several organized townships, and from the time the act took effect they became organized townships of such county, and their supervisors thenceforward were supervisors of such county. These supervisors were not elected under the act organizing Muskegon county, nor did they derive from that act their powers, nor were their duties imposed by it. Such powers and duties spring from the general law regulating the election, powers and duties of such officers.

CARLETON v. THE PEOPLE.

As supervisor of the township of Oceana, the plaintiff in error had certain duties imposed upon him, which, for reasons of public policy, he was imperatively bound to discharge: among these were the assessment of the property of his township, and attendance as a member of the Board of Supervisors of his county at its October session, and the production of his township assessment roll for equalization. We cannot presume that he neglected either of these duties, except that of presenting his roll for equalization.

In October, 1859, the act had taken effect and become a law; and the supervisors of the several townships constituting Muskegon county, were the Board of Supervisors of such county. The assessment rolls of such townships were in their aggregate the rolls of the county, and not of the counties from which the townships had been detached. The revenues of State, county and towns depended upon the faithful discharge of the duties of the supervisors of the several townships, as township officers, and as members of the County Board.

Neither the election of county officers under the fourth section, or their non-election, affects the question of the duty of the supervisors of the new county, either as township or county officers. In either character, the law imposes upon them the performance of positive duties, the non-performance of which cannot be excused by evidence that some other officer could not perform his, or even that there was no competent officer, having power to perform some other duty. It is urged that there could be no county board, for want of a County Clerk—that his existence is vital to that of the Board: I think otherwise. The Board of Supervisors is a constitutional body: — Vide Const. art. X;—and is not dependent for its lawful existence, or power to perform the duties imposed upon it, upon the existence of a clerk constitutionally elected. The law, it is true, provides that the County Clerk shall be the clerk of the Board, but if there be no such officer existing as County Clerk, from any cause,

at the time the Board is required to meet and equalize the assessment rolls of the several townships, and discharge its other public functions, I have no doubt that, from necessity and considerations of public policy, the Board possesses the power to appoint a clerk, who shall be clerk *de facto*, and that it can proceed to the discharge of its public duties. It would be perilous in the extreme to hold otherwise. The whole revenue of the State, and very much local legislation of the county, depend upon the action of the Board; and if such action could be prevented or stayed by the death, sickness or absence of the County Clerk, or any vacancy of his office, public interests would be at the mercy of accident or caprice. I know of no instance, nor can I conceive of any instance in reason, in which the powers of a constitutional body depend upon any such contingency, or are held by any such tenure.

But while I hold that Carleton cannot insist upon the objection that the section providing for the election of county officers rendered the whole act unconstitutional, for the foregoing reasons, I hold further, that if the act be good, except the fourth section, and that be unconstitutional, he could not refuse to discharge his duty, as the case shows that there was, in October, 1859, a clerk *de facto* of the county, and therefore a Board of Supervisors duly organized with a clerk competent to act. As to the rights of third persons and of the public this was sufficient. The question of the legality or illegality of his tenure of office, can only be raised in a direct proceeding in which he is a party. It would be impossible to maintain the supremacy of the laws, if individuals were at liberty, in a collateral manner, to question the authority of those who in fact hold public offices under color of legal title. —See *People v. White*, 24 *Wend.* 520; *Morris v. The People*, 3 *Denio*, 381. The case of *Fowler v. Bebee*, 9 *Mass.* 231, is to my mind strikingly analogous to the present, and contains the only safe rule. The facts were that, on the 17th of August, 1812, an

original writ was issued and served by a deputy sheriff of the county of Hampden. By a statute of 1811 the county of Hampden was erected, and it, among other things, provided that the law should take effect and be in force from the first day of August, 1812. In May, 1812, the Governor of Massachusetts appointed a sheriff of Hampden county, and on the first of August the sheriff appointed the deputy by whom the writ was served. It was insisted that, at the date of the appointment of sheriff, there was no county of Hampden, nor any such officer as sheriff of such county, and that the appointment of sheriff by the Governor, before the act took effect, was void; but the Court held that the sheriff thus appointed was sheriff of the county *de facto*, and that as he was no party to the record, and could not be legally heard, the question of his title to the office should not be heard; saying that the decision, although he was not a party to the record, would as effectually decide his title to the office as if he were a party, and that this would be judging a man unheard, contrary to natural equity, and the policy of the law; and that from considerations like these has arisen the distinction between holding an office *de facto* and *de jure*. Yet in the case of *Commonwealth v. Fowler*, (10 *Mass*. 291), who was appointed Judge of Probate of Hampden county, at the same time as the sheriff in the above case, namely, in May, 1812, upon an information in the nature of a *quo warranto*, the Court held the appointment void. In so holding the Court says, "No public inconvenience need be apprehended from the principle established by this decision; for so long as the persons were *de facto* officers under such an appointment, their official acts were lawful, except only in cases of direct injuries to their fellow citizens. But it is always in the power of the Legislature to provide against this inconvenience, and to prevent all question upon the subject by authorizing the appointment before the act creating the county is to come into operation."

CARLETON v. THE PEOPLE.

In *Bucknam v. Ruggles*, 15 *Mass.* 180, it was held that the acts of an officer *de facto*, having color of title, in the ordinary exercise of the functions of his office, are valid as respects the rights of third persons who may be interested in such acts; that the adoption of such a rule is necessary to prevent a failure of justice, and the great public mischief which might otherwise be justly apprehended; and besides, that the officer's title to his office ought not to be determined in that way. See also *The People v. Collins*, 7 *Johns.* 549; *McInstry v. Tanner*, 9 *Johns.* 135; *The State v. Brennan's Liquors*, 25 *Conn.* 278; *The State v. Williams*, 5 *Wis.* 308; *Brown v. Lunt*, 37 *Me.* 423. In *The People v. Hopson*, 1 *Denio*, 574, which was an indictment for assaulting and beating one Lascelles, a constable, and resisting him in the execution of his duty, the defendant offered to prove that Lascelles had never taken the oath of office, nor given the security required by law, and so was not constable; but Bronson C. J. says, "the evidence would be proper if Lascelles instead of the People were the party complaining of an injury. If he were suing to recover damages for the assault, it would probably be a good answer to the action that he was not a legal officer; but a wrong doer who might be resisted. * * * But it is equally well settled that the acts of an officer *de facto*, though his title may be bad, are valid so far as they concern the public, or the rights of third persons who have an interest in the things to be done. Society could hardly exist without such a rule."

In erecting the county of Muskegon the Legislature probably intended to authorize the election of clerk and other county officers before the act creating the county took effect, to avoid any inconveniences which might otherwise result. Whether this could be constitutionally done or not I will not inquire, for as there was such an election, and the persons chosen entered upon the duties of their offices, they were *de facto* officers, and Carleton

could not refuse to perform his duty as Supervisor, under the pretext that the clerk, or any other officer, was not constitutionally chosen.

I therefore think the judgment of the Court below should be affirmed.

CAMPBELL J.:

The principal question in this case is, whether there were lawful county authorities in Muskegon county in October, 1859.

The statute of 1859, providing for the organization of the county, ordered an election for county officers at the next annual township election in the spring. The law did not take effect until ninety days after the adjournment of the Legislature, and therefore was not in force in time to apply to the April election of 1859. To give the law any force whatever, it must be construed as applicable to the next spring election after it constitutionally took effect; for until a law goes into operation it cannot be noticed or binding at all. Its terms being prospective must be applied to events subsequent to that time. No election or other action can derive validity from that which in itself is invalid and inoperative. In the case of *Rice v. Ruddiman*, decided at this term, my brother Christiancy (in whose view I concurred) gave this interpretation to the statute in question. No election could be had under this statute until 1860.

There could not be an officer *de facto* where no officer *de jure* was provided for. Where the law has provided that an office may legally be filled, then the acts of an incumbent may be valid although not lawfully appointed, because the public, being bound to know the law, know that somebody may or should fill the place and perform the duties; and possession would as to them be evidence of title.

But where the law itself negatives the idea that there can be a legal incumbent, any one assuming to act assumes

what every one is bound to know is not a legal office, and his acts cannot be effectual for any purpose.

I think that, until after the spring election of 1860, the law could not recognize any county authorities in Muskegon county; and that the judgment should be reversed.

Christiancy J. concurred in this opinion.

Manning J.:

The constitutional provision that "No organized county shall be reduced by the organization of new counties to less than sixteen townships, as surveyed by the United States," &c., must be understood to include fractional townships, as no exception is made of them, and there is nothing from which it can be implied.

When the act organizing the county took effect—whether at the expiration of ninety days from the adjournment of the Legislature, or on the first day of June (then) next, when the county officers were required to enter upon the discharge of their duties—the supervisors and other township officers of the townships detached from other counties to form the new county, occupied the same relation to the latter that they had previously stood in to the former. No question therefore was or can be raised as to the supervisors of the new county. It is the county officers elected at the annual township election in April that objection is taken to.

Assuming that they were not officers *de jure*—for I am not satisfied that that part of the act relative to their election comes within the purview of the constitutional inhibition—were they not officers *de facto?* The special verdict states that they were not only elected, but that they qualified and entered upon the duties of their respective offices, and thereafter continued to act as such officers. Where there is no office there can be no officer *de facto*, for the reason that there can be none *de jure*. The county

offices existed by virtue of the Constitution the moment the new county was organized. No act of legislation was necessary for that purpose. And all that is required where there is an office, to make an officer *de facto*, is, that the individual claiming the office is in possession of it, performing its duties, and claiming to be such officer under color of an election or appointment, as the case may be. It is not necessary his election or appointment should be valid, for that would make him an officer *de jure*. The official acts of such persons are recognized as valid on grounds of public policy, and for the protection of those having official business to transact with public functionaries. The wheels of government would sometimes be blocked, and the administration of justice be stayed, if such was not the law. The cases are numerous where the official acts of such persons have been held valid, and I am unable to distinguish the case before us from *Fowler v. Bebee*, 9 *Mass.* 231, which seems to me to be on all fours with it. See also 5 *Wend.* 231, and 17 *Conn.* 585.

The judgment below, I think, should be affirmed.

*Judgment affirmed.*