## THE STATE *vs.* ANTHONY CARROLL.

It is not necessary in all cases, in order that the acts of one acting as an officer without legal right may be holden valid as to the public and third persons, as the acts of an officer *de facto,* that he should have color of election or appointment by the only body which has power to elect or appoint him, or that the appointing or electing body should in all cases possess the legal power.

The expression used in the opinion of the court in *Douglas* v. *Wickwire,* 19 Conn., 492, that " it is enough if the officer acts under color of an election or appointment by the only body which has power to make it," if intended as a general definition, is inaccurate, and the definition given in *Plymouth* v. *Painter,* that an officer *de facto* is one who exercises the duties of an office under color of appointment or election to that office, is not sufficiently comprehensive.

From a general review of the English and American authorities upon the point, it appears that a definition, in order to be sufficiently comprehensive and accurate as a general one, must be substantially as follows: An officer *de facto* is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid, so far as they involve the interests of the public and third persons, where the duties of the office were exercised, 1. Without a known appointment or election, but under such circumstances of reputation or acquiescence as were calculated to induce people without inquiry to submit to or invoke his action, supposing him to be the officer he assumed to be. 2. Under color of a known and valid appointment or election, but where the officer has failed to conform to some precedent requirement or condition, as to take an oath, give a bond, or the like. 3. Under color of a known election or appointment, void, because the officer was not eligible, or because there was a want of power in the electing or appointing body, or by reason of some defect or irregularity in its exercise, such ineligibility, want of power, or defect, being unknown to the public. 4. Under color of an election or appointment by or pursuant to a public, unconstitutional law, before the same is adjudged to be such.

The acts of an officer appointed by and acting under and pursuant to an unconstitutional law, performed before the unconstitutionality of the law has been judicially determined, are valid as respects the public and third persons, as the acts of an officer *de facto.*

Where the constitution prescribed that the judges of the Supreme, Superior, and inferior courts should be elected by the General Assembly, and a judge of a city court was so elected, and it was further provided by law that in case of his sickness or absence a justice of the peace should be called in by the clerk to hold the court as acting judge during such temporary sickness or absence, and a justice of the peace was so called in and acted, it was holden that whether the law was constitutional or not, and whether the call had been recorded according to law or not, he was an officer *de facto,* if not *de jure,* and judgments rendered by him were valid.

State *v.* Carroll.

COMPLAINT for a libel and breach of the peace, brought to the City Court of the city of New Haven. The court found the prisoner guilty, and he appealed to the Superior Court.

The caption of the record of the judgment of the City Court was as follows: "At a City Court held at the city of New Haven this 24th day of August, A. D. 1871, Present, Hon. Wm. W. Morse, justice of the peace, acting judge, holding said court." In the Superior Court the following amendment to the copy of the record of the City Court was filed and allowed:

"The judge of the City Court of New Haven, H. Lynde Harrison, being absent, and he not having requested in writing any justice of the peace residing in said town of New Haven to act in his place, and in the absence of the judge of the City Court of the city of New Haven, and of a justice acting as judge of said court by request and appointment of the judge, in writing; therefore the clerk of said City Court of New Haven, Julius Twiss, Esq., did request, in writing, William W. Morse, a justice of the peace residing in said town of New Haven, to act in the place of the judge of said City Court, which request was as follows, to wit:

New Haven, August 15th, 1871.
Wm. W. Morse, Esq.,

You are hereby requested to appear and act as judge of the Police Court of the city of New Haven, at 9½ o'clock A. M., August 16th, 1871, in consequence of the absence and disability of Judge Harrison, and also to act as said judge until Judge Harrison shall resume his place, or until further notice

JULIUS TWISS,
*Clerk of the City Court of New Haven.*

And thereupon the said Wm. W. Morse, a justice of the peace for New Haven, residing in the town of New Haven, did act in the absence of the judge of the said court, in the place of the judge of said court, August 16, 17, 18, 21, 22, 23, 25, and 26, 1871.

The above and foregoing is a true copy of record.
Attest: JULIUS TWISS,
*Clerk of said City Court of New Haven.*"

State *v.* Carroll.

The prisoner moved to erase the case from the docket of the Superior Court, for the following reasons:

First, because the court before which he was tried was an irregular and pretended court, not holden by H. Lynde Harrison, Esq., the only judge of said court, but by one William W. Morse, who was never elected judge of the same by the General Assembly.

Second, because said court is a court of limited jurisdiction, and if by any means said Morse could have authority to hold said court, it would be indispensable to show upon record how he acquired such authority, and particularly that he was a justice of the peace for New Haven county, residing in the town of New Haven, and that said Judge Harrison was in some way disabled from trying said cause or holding said court; and that said Morse had been duly requested in writing to act as judge; and that said request had been duly recorded; and that the disability of said Judge Harrison had not been removed before the trial of said cause.

The Superior Court found the following facts, and thereupon reserved the case for the advice of this court.

The record of the City Court, of which a copy was allowed by this court to be filed on the seventh day of the present term by way of amendment of the copy previously sent up by the clerk, was first completed by the clerk of the City Court on the 12th day of September, 1871, after the filing of the present motion to erase. Said clerk had the following minutes written by himself, and no other, to guide him in completing said record; first, the following entry made by him, contemporaneously with the occurrences therein noted, in the docket book of the City Court: "New Haven, Aug. 16th, 1871, Wm. W. Morse, Esq., acting judge in consequence of the sickness of Judge Harrison, by written request from the clerk of said court, Julius Twiss, clerk, acted as judge Aug. 16, 17 and 18, also Aug. 21, 22, 23, 24, 25, and 26." Second, the original letter recited in the amended copy of record, which was preserved by the clerk in said book as a part of the minutes from which to complete the record in said case, that being the ordinary course, but not at that time attached thereto, or

to anything else.   Said letter was never copied at length any-
where on the records of said City Court, until the completion
of the record on the 12th of September.   Third, the ordinary
entries on the file and on the docket book itself, containing
the names of the parties, the date of trial, nature of com-
plaint, judgment rendered thereon, and notes of future pro-
ceedings.

*H. Stoddard*, for the State.

*S. E. Baldwin*, for the prisoner.

The Superior Court has no jurisdiction of this case, unless
the files and record show upon their face that it was regularly
appealed, after a legal conviction by the City Court of New
Haven.   City charter, sec. 67.   *Commonwealth* v. *Burns*, 8
Gray, 482.   And if there be a defect of jurisdiction, it is one
which cannot have been waived by the defendant's submitting
to a trial on the merits in the court below.   *Perkins* v. *Per-
kins*, 7 Conn., 565, 558 ; *State* v. *Maine*, 27 id., 281.   The cap-
tion of the record of a criminal proceeding is an indispensa-
ble part of it.   Its office is to show that the proceeding took
place before proper and lawful authority, acting at a proper
time and place, and in a proper manner.   1 Bishop Cr. Proc.,
§§ 152, 153, 916 ; *State* v. *Zule*, 5 Halst., 349.   And as the
City Court of New Haven is a court of inferior and limited
jurisdiction, having cognizance only of crimes committed
within the town of New Haven, and restricted as to the sen-
tences it can impose, it is especially necessary that all its pro-
ceedings should appear on their face to be legal and within
its powers.   The caption of the record of the City Court dis-
closes the fact that the court at which the defendant was tried
and convicted was held on August 24th, 1871, by " Wm. W.
Morse, justice of the peace, acting judge ; " but the court will
take judicial notice that H. Lynde Harrison, Esq., is the
judge of the court, " appointed by the General Assembly."

It will be claimed by the state that Mr. Morse acted as judge
under the provisions of section 73 of the city charter.   This
could not, under our constitution, make him a judge *de jure.*

*Brown* v. *O'Connell*, 36 Conn., 447, 432. It cannot be said that the General Assembly appointed him as judge, because they appointed the *class* of persons from whom the acting judges might be selected. This provision, (even if, regarded as a personal designation, it could cover any but those who were justices of the peace at the time of the enactment of the charter, in 1869,) is a plain attempt to delegate the power of appointment to the judge or clerk, and to give them authority to create at will *pro tempore* judges, whose term shall not be for a year, but during the indisposition or the pleasure of the judge. See *Prince* v. *Sperry*, 6 Conn., 222, 217.

We submit, further, that Mr. Morse was not a judge *de facto*, and that if he were, it would not avail to support the jurisdiction here. Unlike the Hartford judge, Mr. Morse was appointed, not by a representative body, but by the clerk of the court; not with the title of judge, but of " acting judge ; " not for an annual term, but until the real judge should resume his seat. The doctrine of *Brown* v. *O'Connell* ought not to be interpreted as making him a judge acting under color of right, from authority having color of right. The charter says: " The judge of said City Court shall be appointed annually by the General Assembly. He shall take the oath provided by law for judicial officers, and shall hold office until the first day of June in the year following the year of his appointment, and until another shall be appointed and sworn in his stead." Sec. 73. The court is constituted with but one judge. Any other person, therefore, assuming to act as judge, must be a usurper.

But the provisions of the charter themselves, purporting to authorize the appointment of acting judges, were not complied with in this case. They declare that, " in case of the absence of said judge, or of his disability or inability to discharge the duties of his said office, he may request in writing any justice of the peace residing in said town of New Haven to act in his place ; and in case of the like absence, inability, or disability, of the judge, or justice acting as judge by such request, without the appointment of a justice in like manner as aforesaid, the clerk of said court may request in writing any jus-

tice of the peace residing in said town to act as judge; and in either case, *said request being recorded*, such justice may act as judge as aforesaid, and shall have and exercise all the jurisdiction and powers conferred on said judge, until his return, or such inability or disability shall have been removed."

It is only under certain special circumstances that the clerk can call in a justice of the peace, and the record does not show with the necessary precision that these circumstances existed in this case. But if it did, it is not until after the written request has been *recorded*, that the justice can act. It was manifestly the design of the legislature to enable parties in the City Court to see from the record whether any person who might be acting as judge was acting under authority of law ; so that they might decline to appear before it, if the acting judge did not appear to have been regularly called in ; he being in that case a mere usurper. The recording at length of this request was a jurisdictional pre-requisite to Mr. Morse's authority to act ; and no subsequent extension of the record can cure this original informality in the proceedings.

Even if Mr. Morse were a judge *de facto*, it would not support the jurisdiction of the Superior Court in a case like this, where the record shows that he was not a judge *de jure*. If he was not a legally appointed judge, there has been no legal conviction, and no legal appeal ; and the legality of his appointment comes in question on the face of the proceedings. Th direct question presented by an appeal is, Was the judgmente below a proper one ? 2 Hawk. P. C., 652 ; 4 Black. Com., 390.

BUTLER, C. J. We do not assent to the claim made on behalf of the state, that Mr. Morse, when he rendered the judgment in question, was acting as a justice of the peace with enlarged powers. He was not called in, within the intention of the law, to hold a *justice's* court in the City Court room, but to hold the *City Court* as constituted by law, and as an *acting judge* of it, and he did hold that court, and that only. The judgment appealed from is the judgment of the City Court, or a nullity.

Nor do we assent to the other proposition of the attorney for the state, that the motion came too late. If, as is here claimed to be true, a want of jurisdiction appears upon the record, the case may be dismissed by the court on motion of either party, or its own motion, at any stage of the proceedings. In *State* v. *Smith*, cited and relied upon, the want of jurisdiction did not so appear. The question of jurisdiction raised by the motion must therefore be met.

The defendant claims that the law is unconstitutional, and further claims that the court was not legally, if constitutionally, organized, because the letter of the clerk calling in Mr. Morse was not recorded at length, before he assumed the duties of acting judge. Waiving for the present the consideration of the first claim, I am inclined to think that the minutes which were made in the docket book preparatory to a full record, (which we all know and the court have found was in accordance with the general practice in our courts,) were a sufficient record within the spirit and purpose of the law, for they were in the place and of the character which persons inquiring would expect, and were a substantial compliance with its letter. It is not said in terms by the act that the request must be *fully* recorded, and it is only by construction or implication that we can arrive at the conclusion that it should have been done. That implication may be properly controlled by the custom of our courts to consider *such entries* as substantially *records*, to be amplified thereafter. But it is unnecessary to give, and I do not give, a positive opinion on that point for myself or the court; for the defect, if it be one, is a defect of *qualification* in the officer, by reason of an omission of his, or of the clerk, and is not of a character to prevent his acts from being valid as the acts of an officer *de facto*, whether the law under which he was called in was constitutional or not. This will clearly appear hereafter.

If the principle on which *Brown* v. *O'Connell* was decided, viz., that an officer who exercises the duties of an office under and pursuant to the provisions of an unconstitutional law is as to the public and third persons an officer *de facto*, be sound, Mr. Morse was such officer, and the judgment is valid. The

principle was questioned in the argument of that case, and in the dissenting opinion, mainly on two grounds, viz., First, on the ground that there must be, in order to constitute an officer *de facto*, color of election or appointment *by the only body which had power to elect or appoint*; and second, on the ground that a law manifestly unconstitutional has not even the semblance of authority, and cannot confer any color whatever.

A third point was made in the dissenting opinion, to the effect that the court was not constitutionally organized, but if anything more was intended by that point than that the court was not constitutionally organized because Judge Merrill was not elected by the General Assembly, it does not deserve consideration. The constitutional power of the legislature to establish that or any other inferior court was not questioned in the argument of that case, and is unquestionable; and the idea that the want of a provision for the election of the judge by the legislature, or the provision for his election by the common council, rendered the whole act void, is untenable. A law may be good in part, and bad in part, and now that the General Assembly elect the judge, no one supposes that the provisions of the act which established the court should have been re-enacted, or are not valid ; or that there was or is any defect, in that respect, in the law.

But the first two grounds of objection made in that case do deserve consideration, and in justice to the court and the profession I deem it my duty to give them a thorough examination, and to show that beyond all question, Judge Merrill in that case, and Mr. Morse in this, were judges *de facto*, and their judgments valid.

First, then, as to the point that in order to constitute an officer *de facto* there must be color of appointment or election by the only body which had the power to appoint or elect. No authority was cited for it except an expression used by Judge HINMAN in *Douglass* v. *Wickwire*, 19 Conn., 492, and quoted in *State* v. *Brennan's Liquors*, 25 Conn., 283. The claim was that the expression was used as a definition of that which constitutes an officer *de facto*. The expression was this: " It is enough if the officer acts under color of an

election or appointment, by the only body which has the power to make it." With reference to this I observe:

1. That the expression was an entire sentence in the original, and was not used as a definition. It does not in itself import a general rule. It may mean, and was apparently intended to mean, simply that it was *enough in the particular case* that the facts were so, and those of us who knew the late Chief Justice well, and his uniform habit of confining himself to the principles necessary for the decision of a case, know that nothing more was intended by him. If the words are susceptible of a broader meaning when read in connection with the context, it can only be, "that it is enough in any case, etc." They cannot, without violating every rule of construction, be extended so as to mean, as claimed, that it is *necessary in all cases* that color of appointment or election must be given by the only body who had power to make it. The facts in the case of *State* v. *Brennan's Liquors* were substantially similar, and it is obvious that Judge WAITE quoted the expression of Judge HINMAN, not as a comprehensive definition, but as applicable to that case also. Moreover both Judge HINMAN and Judge WAITE were members of the court when the elaborate opinion of Judge STORRS in *Plymouth* v. *Painter*, was given three years before, and concurred in it. In that opinion Judge STORRS said : "The rights of no person claiming a title or interest under or through the proceedings of officers having apparent authority to act would be safe, if he were obliged to examine the legality of the title of such officer up to its original source." That was sound doctrine, universally recognized. But if it be true, as claimed, that the body making the election or appointment must possess competent power, a fact which cannot always be expected to appear, it is necessary that the person dealing with an officer having color of an election or appointment, shall inquire into the competency of the electing or appointing body, or act at his peril. A definition leading to such a result could not have been intended.

2. But if it were admitted that such a definition was in-

tended, it would be entitled to no respect. None such is to be found anywhere, with or without the qualification '*primâ facie*,' in any of the more than two hundred cases which have been decided in England and this country, in respect to this matter. Such a definition is directly in conflict with the principles which underlie the *de facto* doctrine, and to a strong and irresistible current of decision in England and this country, commencing with the earliest case in the Year Books, and extending to the present time.

The first case to be found in the Year Books was that of *The Abbé of Fountaine*, which was tried in 1431. The action was debt on a bond given by one F., as the abbot of the convent of Fountaine, for supplies furnished the convent. The action was brought against one R., as his successor. The defendant pleaded that the abbots of the order were elective; that before the making of the bond, the abbacy being vacant, an election was held, at which R. had twenty-four votes, and F. but eight; that F. procured himself to be instituted and inducted by the visiting ordinary, took possession of the convent, held the same wrongfully as against R., and while so holding wrongfully, executed the bond. And further, that he was thereafter displaced, and R., the duly elected abbot, duly inducted into office. The plaintiff claimed that the plea was not a proper plea in bar, in form or substance, and declined to answer it. The question heard, therefore, was whether the plea was in form and substance a good plea in bar. There was a long and interesting discussion, rather than argument, between the four justices and chief justice and the counsel engaged in the case. Cases were put and analogies drawn from various sources in the law, and various opinions were expressed with more or less certainty by the judges, but no definite conclusion was arrived at, nor is it certainly known that any decision was ever made. The general impression in the courts has been that the bond was held good, and the fact is so stated by Judge STORRS in *Plymouth* v. *Painter*. But there is no clear evidence of the fact on record. The case is principally valuable on account of the opinions expressed by the different judges, and which were not dissented from.

State *v.* Carroll.

Among these I find the following by BABINGTON, Chief Justice: " In every case, if a man be made abbot or parson erroneously, and then is removed for precontract, or for any like matter, yet a deed made by him and the convent, or by the parson and the patron and the ordinary, is good; as if an abbacy or church be vacant, and a man who *had no right pretended to be patron*, and preferred one A, by force whereof he is installed, and then he is ousted by legal process *inasmuch as the patron had no right*; yet a deed which was made before is good. But if abbey or church be legally full, and the patron prefer one, who is instituted by the ordinary, without deposing the other by due process, and then the other makes a reëntry and oust the other, in this case a deed made by him who was put in possession wrongfully is void, because there was always another parson, so that the second was only an usurper."

That statement of the law by the Chief Justice was not questioned by the other judges or the counsel. His object in making it evidently was to bring the attention of counsel to the question on which, in his opinion, the case hinged, viz., whether the election of R. by twenty-four votes made him so presently abbot *de jure* that the office was legally full, so that F. could not be considered, for that technical reason, an abbot *de facto*, by reason of his installation and possession, as some of the judges were inclined to consider him. The statement is undoubtedly sufficient evidence that it was not then necessary, to constitute an officer *de facto*, that the person who made the appointment should have authority to make it, but that, if made by a *pretender*, and the officer was qualified, took possession of the office and acted, he would be a *de facto* officer in respect to the public and third persons.

In 1461, on the accession of Edward IVth, parliament declared the previous Henrys of Lancaster usurpers; but, to avoid great public mischief, also declared them kings *de facto*, and persons were punished in that reign for treason to Henry VIth, not in aid of the lawful claimant of the crown. 1 Bl. Comm., 204.

The next case chronologically was that of *Knowles* v. *Luce* in the same century, Moore, 109. In that case two stewards

were authorized to hold a manorial court jointly, and one held it alone, and took a surrender, and it was held that the surrender was good, for although he could not alone receive the surrender *de jure*, yet he had sufficient color to constitute him an officer *de facto*. In that case it was said by MANWOOD, J., in giving his opinion, that an officer continuing to exercise an office after his time had expired was a good officer *de facto*, and that where the clerk of the lord of the manor held a manorial court without general or especial authority from the lord to do so, he was a good officer *de facto* until disturbed by the lord ; for the tenants were not obliged to examine into his authority, nor was he compellable to give an account of it to them.

In the case of *O'Brian* v. *Knivan*, decided in 1520, Cro. Jac., 552, a new bishop, instituted and put in possession before the old one had been legally removed, was holden a good bishop *de facto* as to third persons.

In *Lord Dacres Case*, decided in 1553, the servant of the steward held a manorial court without any authority, and he was holden a good officer *de facto*, and his acts valid as to third persons. 1 Leonard, 288.

In *Leak* v. *Howell*, decided in 1596, reported Cro. Eliz., 533, the deputy of a deputy was holden a good officer *de facto*, although, the deputy had no authority whatever to appoint.

In *Harris* v. *Jays*, decided in 1599, reported Cro. Eliz., 699, a steward for one of the manors of the county, who could only be appointed by the lord, was appointed by the auditor and surveyor of the county, without any authority whatever, and acted as such, and it was held that he was steward *de facto*, although he could not grant a copyhold which had escheated, because it was in prejudice to the queen ; but that other acts done by him were good.

The case of *Knight* v. *The Corporation of Wells*, decided in 1688, reported Luttwych, 508, was a case where one was legally elected who was disqualified, and he was holden an officer *de facto*.

The important case of *Parker* v. *Kett* was decided in 1693,

and reported 1 Raymond, 658, and 12 Modern, 467. In that case the authorities were reviewed by Lord HOLT, and it was again holden that the deputy of a deputy, although his appointment was wholly without authority of law, (inasmuch as a delegated authority could not be delegated,) derived sufficient color from it to constitute him an officer *de facto*. Lord HOLT, in that case, on such review, cited the cases from MANWOOD'S opinion in *Knowles* v. *Luce*, and the reasoning, approvingly, and gave the definition which has since been adopted and prevailed in the English law, viz. "A steward *de facto* is no other than he who has the reputation of being such steward, and yet is not a good steward in point of law."

The next case was that of *Rex* v. *Lisle*, which was decided in 1738. This case deserves careful consideration. There is a brief, inaccurate, and deceptive report of it in Strange, 1090, but a very full report in Andrews, 163. The case was *quo warranto* against Lisle at the suit of the king, as a pretended burgess in the town of Christ Church. Lisle was nominated by an acting mayor, Goldwire, and elected burgess, but it was claimed that Goldwire was not mayor, either *de jure* or *de facto*, and had no right to nominate. It appeared that he never was in fact elected, but pretended to be so, was sworn in, and acted as such. It also appeared that a quo warranto was pending against him at the time of election, and that *the facts were all known to Lisle*. Several questions were made, of which two only are material. The first was whether Goldwire was mayor *de facto*, the second was whether, if he was such, the nomination and election of Lisle were good.

Upon the first question, " it was held by the whole court, except LEE, C. J., who gave no opinion as to this point, that Goldwire was not so much as a mayor *de facto*. For, in order to constitute a mayor *de facto*, it is necessary that there be some form or color of an election ; but without this the taking the title and regalia of the office, and the acting and being sworn in as mayor, are not sufficient. And with this agrees *The Abbot of Fountaine's Case*. Now here it appears that Goldwire was never elected in fact ; and although it be stated that he was sworn at the leet, it does not appear (as it ought) that this

was agreeable to the constitution of the borough. And it is not material that he acted as mayor, as it is found that a quo warranto was recently prosecuted against him, pending which the present election was made, and that he was thereupon adjudged to be an usurper. The consequence hereof plainly is that the election is void." And LEE, C. J., said, "in these cases the proper question is whether the person be an officer *de facto* as to the particular purpose under consideration, according to 1 Salk., 96."

Upon the second point the court said: "By the whole court: Supposing that Goldwire was a mayor *de facto*, yet the acts here found to be performed by him are not good, because they were not necessary to the preservation of the corporation. In these cases the proper distinction is between such acts as are necessary for the good of the body, which comprehend judicial and ministerial acts, and such as are arbitrary and voluntary. The election of the defendant is of the latter kind. For as the number of burgesses is indefinite, it doth not appear, nor is it stated, as it should have been, that the choice of a burgess was necessary."

The court in continuing their opinion distinguish that case from all others, using the following language: "This case therefore differs from those which have been cited for the defendant, for in those either the act was such as the officer was obliged or compellable to do, as in Palmer, 479, *or such in which a stranger was concerned*, and *had a right to* or *paid a consideration for*." That case related solely to the internal working of a corporation, and the prior cases to which I have alluded were not considered as applicable.

The material part of the report in Strange is as follows: "And upon this state of the case the court were all of opinion that Goldwire must be taken to have been a mere usurper, and that, in order to constitute a man an officer *de facto*, there must be at least the form of an election, though that, upon legal objections, may afterwards fall to the ground."

"The other point was left undetermined, as not being necessary to deliver any opinion upon, as it was not pretended that the presiding of a mere usurper would do, and the court

had determined that Goldwire was no more. But they strongly inclined that the presence of a mayor *de facto*, recently prosecuted, and against whom judgment of ouster had been obtained, would not be sufficient to authenticate the defendant's election. The court gave judgment for the king.''

Upon comparing this report of Strange, (and I have copied all there is of it after the statement of facts,) with the extracts I have given from the full report of the opinion of the court, it will be seen that the report of Strange is inaccurate and deceptive in three particulars. The first is the statement, as a general proposition, that in order to constitute a man an officer *de facto* there must be at least the form of an election. The court said no such thing. They were dealing with a case which concerned the corporation only, and they said that in order to constitute a *mayor de facto* there must be some form or color of an election. The proposition contained in Strange is a general one, embracing all officers, and opposed to all the cases before reported. The proposition of the court was confined to the particular case, involving the *status* of an officer of a corporation in respect to the proceedings of the corporation, and had no reference to the public or third persons. Moreover, it appears in Andrews that the court distinguished the case from cases in which strangers were concerned—an important fact, in respect to which the report in Strange is silent. · ·

The second misrepresentation of Strange is that the court all agreed in that proposition. But the fact appears that LEE, C. J., gave no direct opinion upon the point, but on the contrary said, ''in these cases the proper question is whether a person be an officer *de facto* as to the *particular purpose* under consideration,'' thus limiting the opinion to the particular case. And that distinction is sustained by an irresistible current of authority.

The third misrepresentation is that the second point was left undetermined, whereas it was fully determined by the whole court, and it was distinctly held that, even if *mayor de facto*, the election was void, on the ground that the act concerned the corporation only, and was not a necessary one.

I have been thus particular about that case, because it was misreported by Strange, and related to the internal affairs of a corporation only, and not to the public or third persons, and is not, as his report makes it, in opposition to the whole current of English decisions before and since, but outside of that current, and because the courts of this country have been misled by his report into the adoption of erroneous definitions and conceptions of the subject. The case, however, as will be seen, even as reported by Strange, does not support the idea that there must always be competent or *primâ facie* power in the appointing or electing body, and, so far as I can discover, as reported by Strange, has never been cited or approved by any English court, for any purpose.

The next case was that of *Rex* v. *Bedford Level*, decided in 1805, and reported 6 East, 356. The question in that case was whether a deputy recording officer, who continued to act after the death of his principal, was an officer *de facto*. The case was carefully considered, and Lord ELLENBOROUGH, giving the opinion for the court, disregarding *Rex* v. *Lisle*, and citing from *Knowles* v. *Luce* and *Parker* v. *Kett* approvingly, adopted the definition of Lord HOLT as a general one, and said, "an officer *de facto* is one who has the reputation of being the officer he assumes to be, and yet is not a good officer in point of law." The court held the acts of the deputy registrar to be good until the death of the principal was *known*, but not afterward.

There is the later case of *Margate Pier* v. *Hannam*, 3 B. & Ald., 266, decided in 1833, where a justice was holden an officer *de facto*, though not properly qualified, and some still later cases of disqualification, but none which involved the competency of the appointing power, or which contain a definition.

Upon this review of all the material English authorities running through four centuries, it will be seen that the idea that color can only be conferred by a body or person having power, or *primâ facie* power, to elect or appoint in the particular case, has never been broached in England, but that on the contrary it has been holden, first, that a *parson* presented

by an *usurping patron* who was wholly without authority to present, was a good parson *de facto*. Second, that a clerk of a lord of the manor holding a manorial court without any authority whatever, and deriving color only from his known relation to the lord of the manor as a simple clerk, was a good officer *de facto*. Third, so of the servant of a steward, holding a manorial court without any authority from the steward or the lord. Fourth, so of the deputy of a deputy, to whom authority could not be delegated. Fifth, so of the steward of a manor, appointed, not by the lord who alone had power to appoint, but by county officers who had no authority whatever to appoint. Sixth, a re-affirmance of the doctrine that the deputy of a deputy has sufficient color to make him a *de facto* officer, by Lord HOLT, on a full review of all the cases, in *Parker* v. *Kett*, and the following broad and comprehensive definition given, viz. "A steward *de facto* is none other than he who has the reputation of being the officer he assumes to be, although he is not such in point of law." Seventh, the adoption of Lord HOLT's definition by Lord ELLENBOROUGH and a full court of Kings Bench, as late as 1805, on careful consideration, and as applicable to all officers. And finally, the fact that the definition has never been questioned since in England, and is now the rule there.

Nor has the idea ever been suggested in this country in any of the more than one hundred and fifty cases which have been decided here, so far as I can discover. On the other hand, the authorities which are inconsistent with it are quite numerous. Such are the cases of *Fowler* v. *Bebee*, 9 Mass., 231, where the governor appointed an officer some months before the law creating the office and authorizing the appointment took effect. That case has been a leading one in this country, and been recognized as authority in at least fifty other cases.

Such also is *Parker* v. *Baker*, 8 Paige, 428, where the governor appointed an officer without authority to appoint, and the vice-chancellor held his acts void, and the chancellor reversed the decision, holding him to be an officer *de facto*. So in Nevada, where justices of the peace were elective by the county, and, no election being held, the selectmen without

authority appointed a justice for the town, and the governor commissioned him, and his acts were holden good as those of an officer *de facto*. *Mallett* v. *Uncle Sam Co.*, 1 Nevada, 188. Such also were the following cases. *Taylor* v. *Skrine*, 2 Brevard, 516 ; *The People* v. *White*, 24 Wend., 520 ; *The People* v. *Kane*, 23 Wend., 414 ; *Carlton* v. *The People*, 10 Mich., 250 ; *Cocke* v. *Halsey*, 16 Peters, 71 ; *Commonwealth* v. *McCombs*, 56 Penn. S. R., 436 ; *Clark* v. *Commonwealth*, 29 id., 129.

This review would be imperfect, if I did not add that the definition, irrespective of the idea that there must be competent authority in the appointing or electing body, and as heretofore used in this court, is not sufficiently comprehensive or accurate. I am aware that it is a prevalent one in this country, but its introduction may be traced to the inaccurate and deceptive report of *Rex* v. *Lisle* in Strange. It was so introduced into our law by Judge HOSMER, in *McCall* v. *Byram Manufacturing Co.*, 6 Conn., 428, and has been retained because there has been no occasion for a particular examination of the subject. It was introduced into the state of New York in a somewhat singular manner. Counsel in the case of *The People* v. *Collins*, reported 7 Johns., 549, claimed it as a definition, and in connection with it, that the acts of such an officer were valid as to the public and third persons. Chief Justice KENT expressed his assent to the proposition as settled law. In the opinion given in the case, however, he enlarged upon the validity of the acts of an officer *de facto*, but said nothing about the definition. At that time the definition was unknown to the law, and it is very evident that the assent of the Chief Justice, from the terms of it, had relation to the validity of the acts of such an officer, and not to the definition. In *McInstrey* v. *Tanner*, 9 Johns., 135, the reporter in a note cited the proposition of counsel in *People* v. *Collins*, and gave his readers to understand that the Chief Justice assented to the whole proposition. The definition was subsequently adopted in their courts, but they found it necessary to qualify it afterwards. Thus introduced, it has been adopted by the courts of other states, but several of them have also found it necessary to qualify it, as we shall see.

State *v.* Carroll.

In respect to this subject, as to many others to which the principles of law are to be applied, concise general definitions are difficult, and discrimination is necessary.

The *de facto* doctrine was introduced into the law as à matter of policy and necessity, to protect the interests of the public and individuals, where those interests were involved in the official acts of persons exercising the duties of an office, without being lawful officers. It was seen, as was said in *Knowles* v. *Luce*, that the public could not reasonably be compelled to inquire into the title of an officer, nor he compelled to show a title, and these became settled principles in the law. But to protect those who dealt with such officers when apparent incumbents of offices under such apparent circumstances of reputation or color as would lead men to suppose they were legal officers, the law validated their acts as to the public and third persons, on the ground that, as to them, although not officers *de jure,* they were officers in fact, whose acts public policy required should be considered valid. It was not because of any quality or character *conferred upon the officer*, or attached to him by reason of any defective election or appointment, but a name or character given to his acts by the law, for the purpose of validating them. When therefore, in civil cases, the public or third persons had knowledge that the officer was not an officer *de jure*, the reason for validating the acts to which they submitted, or which they invoked, failed, and the law no longer protected them. That principle was recognized and applied even in *Rex* v. *Lisle*, and particularly in *Rex* v. *Bedford Level.*

It should be remembered that among the earliest cases there was a distinct class entirely independent of color derived from any known appointment or election, where the law said to the public as a rule of policy : " If you find a man executing the duties of an office, under such circumstances of continuance, reputation, or otherwise, as reasonably authorize the presumption that he is the officer he assumes to be, you may submit to or employ him without taking the trouble to inquire into his title, and the law will hold his acts valid as to you, by holding him to be, so far forth, an officer *de facto*. If he

has color of appointment or election, and yet is not a good officer for the want of authority in the appointing power, or irregularity in exercising it, or because there was another lawful officer entitled to the office, or because the incumbent was ineligible, or had not qualified as the law required, or his term had expired, your case is made stronger by the color, but that kind of color is not essential to your protection, for you are not bound to inquire to see that it exists." So the law has spoken in England from the first introduction of the doctrine, as the cases abundantly show. So it speaks there now. So it spoke in this country until that deceptive definition was introduced from Strange, and so it has since spoken, and the definition been modified accordingly, whenever a case has arisen where the policy on which the law was founded has made it necessary that it should so speak, to save the public from mischief, or individuals from loss.

Thus in 1830, in the case of *Wilcox* v. *Smith*, reported 5 Wend., 231, the question arose as to the validity of an execution issued by one who was reputed to be a justice of the peace, and had acted as such for three years preceding the trial. For the first year of that time the town in which he resided was a part of the county of Genesee, for the last two it was a part of the county of Orleans. It was shown that he had not been appointed by the officers of the county of Orleans, nor did it appear that he had ever been appointed by the officers of the county of Genesee. All that was shown was that he took the oath and acted as a justice, while the town was a part of the county of Genesee. There being no color by election or appointment shown, the Court of Common Pleas charged the jury that the process issued by him was void, *as they properly should have done if the definition from Strange was law.* The case went to the Supreme Court, and they had before them the question whether the acts of an officer involving the interests of third persons, where no color of election or appointment was shown, could be validated or not—a question which tested the truth of the definition. The court held that they could be, and put it upon the ground that, without color of election or appointment, he should, under the circumstances,

be presumed to be an officer *de facto*, and say, " the mere claim to be a public officer, and the performance of a single or even a number of acts in that character, would not perhaps constitute a man. an officer *de facto*.  There must be some color of an election or appointment, *or* an exercise of the office, and an acquiescence on the part of the public, for a length of time which would afford a strong presumption of at least a colorable election or appointment."

Another case, which in like manner tested the accuracy of the definition, arose in North Carolina in 1844, and may be found in 4 Iredell, 368.  The question there was whether a deed of trust was duly approved before the clerk, and recorded by the register of Gates county.  It appeared that one John Walton was duly elected register in 1829 for the term of four years, that being a statutory term, and there being no provision authorizing him to hold over.  It further appeared that, without any new appointment or a legal right to continue in the office, he did continue to exercise the duties of register until 1843, and until after he recorded the deed in question. It was claimed that all his acts after the expiration of his official term under the original appointment were wholly void, and therefore that the deed had not been duly registered, and that no estate had passed.  The court did not attempt to hold that the original appointment gave any color to Walton during his occupancy of the subsequent terms, but held, upon broad, general principles, that his acts must be validated to prevent private losses and general mischief, which the reporter embodied in the following syllabus: " The acts of officers *de facto*, acting openly and notoriously in the exercise of the office for a considerable length of time, when they concern the rights of third persons or the public, are valid as if they were the acts of rightful officers."  The court refer to a prior case in the same volume—that of *Burke* v. *Elliott*—in which they say, that there must at least be some colorable election and induction into office *ab origine*, or so long an exercise of the office, and acquiescence therein by the public authorities, as to afford the individual citizen a presumption strong that the party was duly appointed, and therefore that every person might compel

State *v.* Carroll.

him, for the legal fees, to do his business, and for the same reason was bound to submit to his authority as the officer for the country. "A public office," they say, " is to be supposed necessary for the public service, and for the convenience of all the various members of the community; and therefore that it will be duly filled by the public authority. When one is found actually in office, and openly and notoriously exercising its functions in a limited district, so that it must be known to those whose official duty it is to see that the office is legally filled, and also that it is not illegally usurped; and when this goes on for a great length of time, or for a period which covers much of the time for which the office may be lawfully con- ferred, it would be entrapping the citizen and betraying his interests, if when he had applied to the officer *de facto* to do his business, and got it done as he supposed by the only per- son who could do it, he could yet be told that all that was done was void, because the public had not duly appointed that person to the office which the public allowed him to exercise." There again it was found that the definition was not sufficiently broad and comprehensive.

A similar case arose in Maine, in 1854, *Brown* v. *Lunt*, 37 Maine, 322. A justice of the peace, an annual officer, without any legal right to hold over, who had been justice for many years in succession, was not re-appointed, but continued to act, and took the acknowledgment of an important deed. The question was raised whether the act was valid and the deed good. The deed was executed about two years after his term of office expired, and the court held the acknowledgment good. In an elaborate and learned opinion they say, that an officer *de facto* is one who has the reputation of being an officer, (citing from *Parker* v. *Kett* and *Rex* v. *Bedford Level*,) or one who actually performs the duties of an office with ap- parent right, and under claim and color of an appointment or election, or one who exercises the duties of an office with at least a fair color of right, or an acquiescence by the public in his official acts, so long that he may be presumed to act as an officer by right of an appointment or election. The case was sustained on all these grounds. It was a case where there

was sufficient reputation, and sufficient ground for presumption, but in my judgment not a case of color. It seems to me absurd to say that color from election or appointment can extend beyond the distinct and independent term for which the officer was elected or appointed—beyond the term when the election or appointment could be operative, if legal.

These cases seem to me sufficient to show that even our definition of a *de facto* officer, as introduced by Judge HOSMER from Strange, is imperfect, and tends to obscure the true character of the doctrine. They are all cases of usurpation, without election or appointment for the terms during which the acts were done, or color from that source, and sustainable only on the ground of reputation and presumption.

Doubtless color of election or appointment from competent authority is necessary for the protection of an officer *de facto*, when he is assailed directly because of his acts. And there are other distinctions which bear upon the relation of an officer, as that he cannot collect his fees, or claim any rights incident to his office, without showing himself to be an officer *de jure*, but which do not bear upon the case in hand. I will not pursue that branch of the subject any farther than to say, that we shall see hereafter that an officer will be protected in relation to all acts done under or pursuant to public law, before it is judicially determined to be unconstitutional.

A definition sufficiently accurate and comprehensive to cover the whole ground must, I think, be substantially as follows: An officer *de facto* is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid so far as they involve the interests of the public and third persons, where the duties of the office were exercised,

First, without a known appointment or election, but under such circumstances of reputation or acquiescence as were calculated to induce people, without inquiry, to submit to or invoke his action, supposing him to be the officer he assumed to be.

Second, under color of a known and valid appointment or election, but where the officer had failed to conform to some

precedent requirement or condition, as to take an oath, give a bond, or the like.

Third, under color of a known election or appointment, void because the officer was not eligible, or because there was a want of power in the electing or appointing body, or by reason of some defect or irregularity in its exercise, such ineligibility, want of power, or defect being unknown to the public.

Fourth, under color of an election or appointment by or pursuant to a public unconstitutional law, before the same is adjudged to be such.

Anything less comprehensive and discriminating will, I think, be imperfect and deceptive as a definition.

We come now to the second and more important proposition advanced in *Brown* v. *O'Connell*, to the effect that " a law passed by the legislature cannot have color of authority, or the semblance of authority, unless it appears *primâ facie* to be law, and that it cannot so appear if it is manifestly repugnant to the constitution; that a law of doubtful constitutionality may be presumed to be constitutional until it is judicially decided to be otherwise, but that a law manifestly unconstitutional is void upon its face, and unable to confer the appearance or color of authority." The inference to be drawn from these assumptions necessarily is, that a manifestly unconstitutional law is without any force whatever, and that whether manifestly unconstitutional or not, and whether to have the appearance and force of law or not, are questions for the private judgment of the citizen. If these assumptions were true they would dispose of this case, but they are of novel impression, and fundamentally erroneous. Every law of the legislature, however repugnant to the constitution, has not only the appearance and semblance of authority, but the force of law. It cannot be questioned at the bar of private judgment, and if thought unconstitutional resisted, but must be received and obeyed, as to all intents and purposes law, until questioned in and set aside by the courts. This principle is essential to the very existence of order in society. It has never been questioned by any jurist to my knowledge. It was never questioned even by Mr. Calhoun and his disciples that an un-

constitutional law of congress, manifestly and palpably uncon-stitutional, had the color and semblance of authority, and was obligatory upon the citizens of a state, as citizens of the United States, until it was nullified by an act of the state legislature, which they claimed might be done on the ground that the general government was the creature of a compact between the states, and its laws might therefore be so nullified by ac-tion of the state legislatures. Certainly they never asserted that a legislative enactment of a state, having all the forms of law, had not the force of law to all intents and purposes as against the citizen of the state, however repugnant to the state constitution, until set aside by the courts.

The doctrine that a law of doubtful constitutionality may be presumed to be constitutional until judicially decided other-wise, and that a law manifestly unconstitutional cannot be so presumed, has no existence as applicable to the citizen. There is a rule of judicial construction adopted by the courts, to the effect that unless the law is clearly unconstitutional, or if it is of doubtful constitutionality, they will not declare it uncon-stitutional. But that is a rule of *purely judicial construction*, and can have no other application. That rule has been re-peatedly recognized in this court. Thus in *Hartford Bridge Co.* v. *Union Ferry Co.*, 29 Conn., 210, Judge ELLSWORTH says: " It is however a well settled principle of judicial construction, that before an act of the legislature ought to be declared un-constitutional, its repugnance to the provisions or necessary implications of the constitution should be manifest, and free from all reasonable doubt. If its character in this regard be questionable, then comity and a proper respect for a co-ordi-nate branch of the government should determine the matter in favor of the action of the latter." It has never been claimed to my knowledge before, that the citizen may adopt that judi-cial rule of construction, and treat a law, if manifestly un-constitutional, as without the semblance or color of authority. It is an instance of the misapplication of an unquestioned rule.

If then the law of the legislature, which creates an office and provides an officer to perform its duties, must have the

VOL. XXXVIII.—60

force of law until set aside as unconstitutional by the courts, it would be absurd to say that an officer so provided had no color of authority. But on this question we need not reason. There is an irresistible current of authority in this country which determines it.

As early as 1815 the question arose and was settled in South Carolina. The constitution of that state provided that the judges of the Superior Court should be elected by the legislature in joint ballot. The legislature subsequently passed a law authorizing the governor to appoint a judge to hold the court temporarily during the sickness of the judges. That law was holden unconstitutional. The question subsequently arose in the case of *Taylor* v. *Skrine*, 3 Brevard, 516, whether a judge appointed by the governor under the law, and who held a term pursuant to appointment, was a judge *de facto*, and it was holden that he was, and his judgments valid. The reasoning of the court was sound and forcible, but I have not space for it.

The question subsequently arose in the Circuit Court of the United States in Mississippi, and was carried to and determined by the Supreme Court of the United States, in *Cocke* v. *Halsey*, 16 Peters, 71. By the constitution of that state judges and clerks of probate were made elective by the people. The legislature provided by law, that in case of the disability of a clerk the court of probate might appoint one. An elected and qualified clerk of one of the courts of probate left the state for an indefinite period, and the judge appointed another to serve during his absence, and the question was whether he was a *de jure* clerk, and if not, whether he was such *de facto* ; it being claimed that the law authorizing his appointment was unconstitutional. The Supreme Court held him, as to the public and third persons, admitting the unconstitutionality of the law, a clerk *de facto*.

The constitution of the state of New York provides that " the governor shall nominate by a message in writing, and with the consent of the senate shall appoint, all judicial officers except justices of the peace." In manifest disregard of that plain provision, the legislature passed a law authorizing

the common council of the city of Albany to establish a police court, and appoint a police judge.   After a time the constitutionality of the law in respect to the judge was questioned, and the judge was removed by a quo warranto to the Supreme Court.   No question was of course made on the quo warranto in relation to the validity of the acts of the judge, but, in the subsequent case of *The People* v. *White*, the court, in reviewing the cases in relation to *de facto* officers, said: " Still more recently we have pronounced judgment of ouster against the police judge of the city of Albany.   *The People* v. *Kane*, 23 Wend., 414.   But those who executed his mandates, while he held under the forms of law, are as perfectly protected as though there had been no defect in his title, and his orders and judgments are as valid and effectual as though he were an officer *de jure.*"   *That case was "ad idem" with Brown* v. *O' Connell.*

Another case of substantially the same character, *The People* v. *White*, already alluded to, is reported 24 Wend., 520. There the legislature, by a special law, made the aldermen of the city of New York *ex officio* judges of the oyer and terminer.   A prisoner was convicted of murder before that court, two of the aldermen sitting with the other judges. Objection was made by the prisoner to the organization of the court, on the ground that the law authorizing the aldermen to sit was manifestly unconstitutional.   But the Supreme Court held that the aldermen were nevertheless judges *de facto*. The case was carried to the Court of Errors, and in that court there was no dissent in relation to that point of the case, except by the chancellor, and four of the seven members of the court who gave opinions expressly concurred on that point with the Supreme Court, the two others expressing no opinion upon it.   Senator Verplanck, the strongest man perhaps among them, covered the whole ground by the following paragraph: " Thus, in respect to the judicial character of the aldermen, I agree with the Supreme Court that the aldermen, whether constitutionally or not, are judges of the oyer and terminer —are so *de facto*—their commissions being written in the

statute book, which is to be presumed valid and constitutional throughout until it is otherwise decided as to any provision. I agree therefore that their acts as judges cannot be impeached subsequently, collaterally, or by private suit, or criminal proceedings against them as individuals, under any view of their constitutional rights." Nothing was ever more clearly, comprehensively, or truthfully expressed. The case was reversed on other grounds.

The same question arose in the state of Michigan, in the case of *Carlton* v. *The People*, 10 Mich., 250. By a provision of the constitution of that state, the laws of the legislature were to take effect and become operative ninety days from the passage thereof. The legislature, on the 4th of February, passed an act creating a new county, and authorized the election of county officers in April ensuing. The officers were elected in April within the ninety days, and before the law could constitutionally take effect, and they subsequently acted as such. The validity of their acts was questioned, on the ground that the law was unconstitutional and inoperative, inasmuch as it could not authorize an election within the ninety days. A majority of their Supreme Court held that, however that might be, the officers had color of title from the law, and their acts were valid as those of officers *de facto*.

The same question arose in the state of Pennsylvania, in *Clark* v. *Commonwealth*, reported 29 Penn. S. R., 129. The constitution of that state provided that the state should be divided into judicial districts, and that the presiding judge of the county court in each district should be elected by the people thereof. The legislature by law transferred a county from one judicial district to another, during the term for which the judge of the district had been elected, and the then presiding judge of the district to which the county was by law so transferred held court in that county, and a prisoner was convicted before it of murder. It was objected on behalf of the prisoner, that the act of the legislature was equivalent to the appointment of a judge for that county, and therefore unconstitutional. The case was carried to the court of last resort,

and it was there held that, admitting the law to be unconstitutional, the judge who acted under and pursuant to it was a judge *de facto*, and the prisoner could not be heard to deny it.

In another and very recent case in that state, *Commonwealth* v. *McCombs*, 56 Penn., 436, the question whether an unconstitutional act of the Assembly was sufficient to give color of title, and constitute an officer appointed by and acting under it an officer *de facto*, again came up, and was again determined in the affirmative. Judge STRONG, now of the Supreme Court of the United States, gave the opinion of the court and said : " When he who is exercising the duties of an office is acting under the apparent authority of an act of Assembly, his title to the office is not to be assailed collaterally. This I understand to have been again and again decided. An act of Assembly, even if it be unconstitutional, is sufficient to give color of title, and an officer acting under it is an officer *de facto*." This case was decided as late as 1867, and states the proposition as one which has been frequently decided.

These seven cases are all that I can find which bear directly upon the point. There is a large class of cases where the appointees were ineligible under the constitution, yet held officers *de facto*, some of which were appointed by the legislature, and their appointments holden void, but they are not so directly in point as those I have cited. Those seven cases, all decided since 1814, are all in point, are all one way, and unopposed by any conflicting decision. They were all cases of manifest repugnancy, and they form a body of authority resting on fundamental principles quite sufficient to sustain the decision of the court in *Brown* v. *O'Connell*, and that must control this part of the case.

The question whether the act under which the justice held the city court was constitutional or not, we do not think proper, under the circumstances, to decide. As he was clearly a judge *de facto*, a decision of the question is not necessary, and it has not been, and should not be, the practice of this court to decide upon the constitutionality of an act of the General Assembly unnecessarily, nor without full and exhaustive argument. Such argument we have not heard in this case—the

question being scarcely alluded to on behalf of the state. Moreover, there is a cotemporaneous exposition and practice in relation to the subject peculiar to this state, and other existing laws, which render the question one of grave importance.

The constitution provides specifically for two courts—a Supreme and a Superior Court—and for the election of judges for each. Yet in the first judiciary act which was passed under the constitution, and with the concurrence of many of the men who framed it, the judges of the Supreme Court were made *ex officio* judges of the Superior Court, and that provision remained in force unquestioned from 1821 until the courts were re-organized in 1855. Prior to 1855, no judges of the Superior Court were elected distinctively as such, and those courts were held by the Supreme Court judges, *ex officio*, and by their own allotment.

In like manner in the first judiciary act succeeding the adoption of the constitution, the county courts were authorized to be holden in part by justices of the peace, when two of the judges were disqualified, and entirely by justices when all of the judges were disqualified. So the law in relation to the county court stood so long as that court was organized with three judges, and until 1838. After the number of judges of that court was reduced to one, and county commissioners appointed to perform its local duties, in 1839, a law was passed providing that the place of the judge should be supplied when necessary by the county commissioners, with such justices of the peace as they should select. In case a commissioner was disqualified to sit, the judge of the court was authorized to select a justice of the peace to preside in his place. If the judge and all the commissioners were disqualified, it was provided that the court should be holden by three justices of the peace selected by the sheriff. The county court was re-organized in 1841 by the appointment of three judges for the entire state, and the provision that the county commissioners should hold a court, when the judge assigned to hold it should be disqualified, was retained.

So, laws providing that the duties of the judge of probate when the office was vacant, or the judge disqualified, should

bo performed by the judge of an adjoining district, and laws authorizing him to call in originally justices of the peace, and since a judge of the county or superior courts to aid in the trial of disputable cases, have in some form existed since 1716. And now we have a law also authorizing this court to be filled up, in case of vacancy or disability, by calling in judges of the Superior Court, and many cases have been decided by this court when so constituted in part within the last three years, which would be reversible on error, if the law is unconstitutional. A decision which may overturn a system of laws by which all our courts, including this, are filled up in cases of emergency, should not be lightly made.

Looking then to the general practice which existed in relation to the manner of filling the courts in cases of vacancy or disability, from an early period in the history of the state, and to the cotemporaneous and continued adoption of the practice under the constitution ; to the fact that a decision of the question may reach all the courts of the state, and that it has not been fully argued ; and the fact that the decision of the question is unnecessary in the case, for that the justice must be holden to have been a judge *de facto*, and his judgment valid in any event, we deem it our duty to leave the question undecided.

In this opinion CARPENTER, FOSTER and SEYMOUR, Js., concurred. PARK, J., concurred in the result, but dissented from the views expressed by the court in reviewing the case of *Brown* v. *O' Connell.*