### JUAN MARTA AND ROCINDO BONADO V. THE STATE.

No. 4200. Decided December 27, 1916.

Rehearing overruled March 28, 1917.

**1.—Murder—Continuance—Want of Diligence.**

Where, upon trial of murder, the application for a continuance showed a want of diligence, and in the motion for new trial the location of the witnesses was not shown, and the court was not put in possession of any fact which could reasonably lead the court to believe that the absent witness could be found, if the case were postponed, there was no error in overruling the application. Davidson, Judge, dissenting.

**2.—Same—Affidavit—Practice on Appeal.**

Where appellant, after the case was pending in this court, filed an affidavit stating that his absent witness had been located and to what he would testify, the same could not be considered as the record on appeal can not be supplemented by ex parte affidavits on any issue except the jurisdiction of the court.

3.—Same—Severance—Rule Stated.

The statute, article 727, Code Criminal Procedure, requires the defendant to state in his affidavit for severance as a matter of positive averment that the testimony of his co-defendant will be material to his defense, and where this was not done, there was no error in overruling the application. Following Shaw v. State, 39 Texas Crim. Rep., 161. Davidson, Judge, dissenting.

4.—Same—Evidence—Leading Questions—Discretion of Court.

Where the .witness had a poor understanding of the English language, there was no error in permitting the State to propound to him leading questions in the absence of a showing of abuse of the discretion of the court, and this although. an interpreter was present; besides, under the facts of the case, there was no reversible error.

5.—Same—Witnesses—Surprise—Rule Stated.

When surprise at the testimony of a witness is relied on as a ground for .a continuance, the court must be put in possession of some fact 'or circumstance where by granting time the person will be enabled to meet, or at least minimize, the force of the testimony, and where this is not done there is no error in over- ruling the application. Following Davis v. State, 60 Texas Crim Rep., 620, and other cases.

6.—Same—Evidence—Leading Questions.

Upon trial of murder, where the conviction depended upon circumstantial evidence, there was no error in permitting the State to ask a witness whether he observed any blood upon either of the defendants shortly before the homicide. This under the surrounding facts of the case, was not a leading question, the facts showing that blood was observed on one of the defendants after the hom- icide. Following Kennedy v. State, 19 Texas Crim. App., 618, and other cases.

7.—Same—Evidence—Shorthand Facts.

Upon trial of murder, there was no error in permitting a State's witness to testify that he pointed out to the sheriff and others the place where he said he saw defendants on the night of. the homicide and where they got into the wagon of the deceased; this was not hearsay but a shorthand rendering of the facts; nor was it hearsay to permit the sheriff to testify as to tracks on the ground, etc. Following Williams v. State, 60 Texas Crim. Rep., 453, and other cases.

8.—Same—Rule Stated—Opinion of Witness.

An opinion, so far as it consists of a statement of an effect produced on the mind, becomes primary evidence and admissible whenever the condition of things is such that it can not be reproduced and made palpable in the concrete. Following Miller v. State, 18 Texas Crim. App., 232, and other cases.

9.—Same—Charge of Court—Weight of Evidence.

Where a requested charge with reference to the testimony of a certain wit- ness would have been on the weight of the evidence, the same was correctly refused.

10.—Same—Argument of Counsel.

Where State's counsel remarks, to the effect that the defendants were guilty of a foul assassination, was borne out by .the evidence, and besides, the court instructed the jury not to consider them, there was no reversible error.

11.—Same—Argument of Counsel.

Where the bill of exceptions showed that counsel for the State was com- menting on an occurrence that took place during the trial and correctly recited it and only added thereto that it was a strong circumstance, there was no error; besides, the remarks were withdrawn by the court.

**12.—Same—Argument of Counsel.**

Where the record authorized counsel for the State to criticize the conduct of a witness, there was no reversible error; besides, the jury were instructed not to consider the argument.

**13.—Same—Argument of Counsel— Matters Dehors the Record.**

While it was improper for State's counsel to say that the law books were full of cases in which convictions had been secured on circumstantial evidence, which was not nearly as strong as in the instant case, yet where the court reprimanded counsel and instructed the jury not to consider them, there was no reversible error, in the absence of requested instructions.

**14.—Same—Sufficiency of the Evidence—Death Penalty.**

Where, upon trial of murder, the evidence, although circumstantial, was sufficient to sustain the conviction assessing the death penalty, there was no reversible error.

**15.—Same—Continuance—Motion for New Trial—Want of Diligence.**

Where the application for continuance showed a want of diligence, and there was nothing shown in the motion for new trial that it was reasonably probable that if the alleged absent testimony had been before the jury, a verdict more favorable to the defendant would have resulted, there was no reversible error. Following Covey v. State, 23 Texas Crim. App., 388, and other cases.

**16.—Same—Severance—Matter of Right—Rule Stated.**

Where the bill of exceptions showed that when the case was called for trial no request for a severance was made, and not until after the application for a continuance was overruled, a special venire had been called, and a portion of the jury had been selected and sworn, and several challenges had been exhausted, a request was made for severance, the same was not matter of right and came too late to make it so. Davidson, Judge, dissenting.

**17.—Same—Leading Questions—Rule Stated—Bill of Exceptions.**

A bill of exceptions taken because of leading questions must affirmatively exclude the idea°that, under the peculiar circumstances of the particular case, the court was justified in permitting the State to ask leading questions, and if it does not do so, no error is shown. Following Carter v. State, 59 Texas Crim. Rep., 73, and other cases. Besides, there was no error in the ruling of the court in permitting the questions to be asked.

**18.—Same—Argument of Counsel—Requested Charge—Practice on Appeal.**

Where, upon appeal from a conviction of murder, the bills of exception showed that in each instance defendant's objection to the argument of counsel were sustained, and the jury instructed not to consider such remarks, and in some instances State's counsel was reprimanded by the court, there was no reversible error, in the absence of requested instructions. Following Davis v. State, 54 Texas Crim. Rep., 236, and other cases.

**19.—Same—Postponement—Surprise.**

Where counsel for defendant could not have been surprised at the testimony of their witness, there was no error in not permitting a postponement of the trial. Following Evans v. State, 13 Texas Crim. App., 225, and other cases.

**20.—Same—Rehearing—Disqualification of Judge—Practice on Appeal.**

Where appellant's motion alleging that one of the judges of this court had vacated his office, and was, therefore, disqualified to sit as a member of this court, was duly considered and overruled, and appellant thereafter sought to reopen the question by placing in the hands of the members of this court another motion on this ground, the same will not be filed among the papers of the case; first, because they present no constitutional nor statutory grounds of disqualifi-

cation of such judge; second, because they are a collateral attack; and third, because they show that such judge was a de facto judge of this court even if he could not be held at the time to be a de jure judge.

Appeal from the District Court of Travis.  Tried below before the Hon. A. S. Fisher.

Appeal from a conviction of murder; penalty, death.

The opinion states the case.

*B. F. Patterson* and *A. L. Love,* for appellants.—On question of continuance:  Jackson v. State, 5 S. W. Rep., 372; Stanley v. State, 16 Texas Crim. App., 392; Beaty v. State, 16 id., 421.

On question of leading questions: Ripley v. State, 51 Texas Crim. Rep., 136, 100 S. W. Rep., 943; Seago v. White, 45 Texas Civ. App., 539, 100 S. W. Rep., 105; Garrett v. State, 52 Texas Crim. Rep., 255, 106 S. W. Rep., 389; Godsoe v. State, 52 Texas Crim. Rep., 626, 108 S. W. Rep., 388.

On question of hearsay and opinion of witness: Liles v. State, 58 Texas Crim. Rep., 310, 125 S. W. Rep., 921; Mosely v. State, 67 S. W. Rep., 103; Smith v. State, 45 Texas Crim. Rep., 405, 77 S. W. Rep., 453; Williams v. State, 30 Texas Crim. App., 429, 17 S. W. Rep., 1071; Pool v. State, 48 Texas Crim. Rep., 478, 88 S. W. Rep., 350; Cavaness v. State, 45 Texas Crim. Rep., 209, 74 S. W. Rep., 908.

*E. B. Hendricks,* Assistant Attorney General, *C. A. Sweeton,* Assistant Attorney General, and *W. C. Linden,* for the State.—Cited cases in opinion.

HARPER, Judge.—Appellants were jointly tried and convicted of the murder of Eugene Smith, their punishment being assessed at death.

Mr. Smith came to Austin on Saturday, October 2, 1915, bringing some cotton seed and two bales of cotton on his wagon, which he sold on that day.  On his way home that night he was shot in the head twice, one ball entering just at the back of the ear, and his body thrown from the wagon.  The State's contention is that he was murdered in the perpetration of robbery.  The next morning appellants and others were arrested while the sheriff's force was investigating the murder. All arrested were released after the investigation except the appellants, and they were indicted by the grand jury, the indictment being returned on December 24, 1915.

This is a case in which the State relies on circumstantial evidence, no witness for the State seeing the fatal shots fired.  The State by its evidence would have appellants see Mr. Smith bringing the cotton seed and cotton to Austin that day, and see him going out of the city towards home.  Mr. Smith stopped at John Miller's to pay for some potatoes, and that appellants came in the store while Mr. Smith was there and attempted to purchase some cheese and crackers but had no money.  Mr. Smith is then traced to Gus Koehn's, where he stopped

and paid a debt he was owing, and made a small purchase. This was introduced as fixing the time Mr. Smith left the city and that appellants were aware of the fact, the time being fixed in the neighborhood of 9 o'clock at night. Hunter Hill's place is some two miles farther on the road Mr. Smith would travel going home, and Will Eppright says he left Hill's at 9:30 (closing time) and started towards Austin; that he met Mr. Smith on his road home. This was the last time Smith was seen before being shot, his body being found by the side of the road some distance farther on, just beyond Hill's place and Dick White's saloon and restaurant, some three miles from Austin. The exact distance beyond these places where the body was found is not shown by the record, but we would judge it was in the neighborhood of a half or three-quarters of a mile, judging by the map in the record. The body was discovered by four young men, Carl Lingren and others, who left Austin about 10 o'clock, and passed the body, discovering later the team loose, when they went on to Mr. Bergstrom's. They reported to him what they had seen. Mr. Bergstrom got a lantern and they all went back, catching the team and tying it; when they got to the body they did not recognize the man, he being so bloody. They telephoned Sheriff Matthews, who, with Deputy Sheriff Eugene Barbisch, drove out in an automobile, got the wounded man and brought him to the Seton Infirmary for such medical aid as could be administered. The sheriff and his deputy and others returned to the scene and waited for daylight to begin investigation; they discovered where the brake must have been thrown on the wagon, as the wheel dragged, and followed this dragged track, finding where blood had dripped on the ground; when they got to where the body had been thrown from the wagon the wheel again began to revolve, and about this place they discovered where two men had jumped from the wagon; they tracked the men to Gilbert's gin, finding a whole cigar and a stub; from this gin the tracks of the two men separated, Sheriff Matthews and others following the track that led to Littlepage's store, where appellant Bonada was found and arrested, he having blood on his clothing and hat. Mr. Gilbert and others followed the other track, and by information received, where appellant Juan Marta changed his clothing, found and arrested him. The State placed appellants in Miller's place when deceased was in the store; placed them at Hunter Hill's place at 9:30 o'clock, where they purchased beer and two cigars, leaving that place as the saloon closed. It then traced them to Dick White's after 9:30, where they were seen by several, the time of their departure from this place not being fixed absolutely certain. The other circumstances relied on by the State will be recited and discussed hereinafter in passing on the bills of exception.

The appellants both testified and both admit being at Miller's, and that they attempted to buy cheese but could not at that time find their money they say they had, and that Mr. Miller refused to sell them; they admit being at Hunter Hill's at 9:30, and that they purchased

beer and two cigars; they admit going to Dick White's and going from there to Gilbert's gin, where they spent the night; they admit the cigar and stub found at this gin were the two cigars purchased at Hill's at 9:30; they admit getting up early the next morning and traveling the way the officers say they tracked them to the places where they were arrested. Marta denies any blood being on his clothing, and he gives as an excuse for changing clothes that he got his pantaloons wet in going through the cotton fields from dew. Bonada admits he had blood on his clothing, but explains it by saying his nose had bled on Saturday afternoon while he was in Austin. They admit they were constantly together from the time they left Austin until the next morning.

So a great many of the circumstances proven and relied on by the State became proven facts after the defendants had testified. That Bonada had blood on his clothing when arrested was not denied, but an explanation offered, which the State sought to prove untrue. This was one of the contested issues in the evidence. And while they admit traveling the road from Dick White's to Gilbert's gin and spending the night at the gin, they endeavor to prove that Smith had been murdered before they left Dick White's restaurant. On this issue the evidence is conflicting. Juan Laerma testified that he overtook appellants at a turn in the road near where the body was found and had a conversation with them; that they told him they were waiting for a wagon, and while talking to them, deceased, Mr. Smith, came driving along, when both appellants got in the rear of the wagon, and he galloped on off; that when he got a short distance he heard two shots but went on home. Appellants testify and admit they met Laerma about the place he says and had a conversation with him, but deny Mr. Smith came along; they say they and Laerma went on down the road, Laerma going on ahead; that they went on down the road and saw an object lying by the side of the road; that a buggy passed them, and then a wagon with negroes passed them; and they tried to get the negroes to let them ride; that they then met an automobile, and this is shown to be the automobile in which Mr. Bergstrom and others were traveling on the way back to the body of deceased.

It is thus seen that the conflict is, the State contends they were on the road waiting for Mr. Smith, got in his wagon and killed him, robbing him of his money; the appellants contend they did not leave Dick White's in time to have committed the offense, and when they passed along the road someone else had already slain Mr. Smith, as he was lying on the side of the road when they passed. This was a sharply contested issue.

When the State announced ready, appellants moved to continue the case on account of the absence of some half dozen witnesses. The attendance of all of them was secured, except Eugenio Rios. The testimony of this witness would be material to the defense of appellants, but cumulative of the testimony of other witnesses. As this is the first

application, the fact the testimony was cumulative would not deprive appellants of the right to continue the case if they used diligence to secure his attendance, but we think the record discloses a lack of diligence.   Appellants as hereinbefore stated were indicted. December 24, 1915.   No subpoena was issued for the witness until February 22, 1916, and the sheriff by his return on the process shows he could not find the witness in the county.   This was but a short time before the case was set for trial.   In the application they state, "that the witness Rios was a resident of Travis County during the fall of 1915, and so far as these defendants have been able to ascertain is still a resident of the county; that there are residing in Travis County and also in Bexar County, Texas, Mexicans by the name of Rios, and they believe if given until the next term of court they will be able to locate the witness."   It is thus seen at the time of the trial appellants did not know the location of the witness; whether he was in Travis County or Bexar County, or at some other point.   This information was too indefinite, and in the application it is not shown that appellants had used any diligence to definitely locate the witness; and in the motion for a new trial complaining that the court erred in this respect, it is still shown that the location of the witness was not known, and the court was put in possession of no fact which would or could reasonably lead the court to believe the witness could be found if the case was postponed.   Under such circumstances, there was no error in overruling the motion.   The term of court at which appellants were tried adjourned April 29th. Appellants in November of this year, and after the case was pending in this court and set for hearing, filed an affidavit stating that this witness had been located and to what he would testify.   This affidavit can not be considered for any purpose.   We must pass on the case on the record made in the trial court, and it is never permissible to supplement the record by ex parte affidavits on any issue except the jurisdiction of the court.   They are authorized to be filed in no other instance.

After the motion for a continuance had been overruled and a portion of the jury selected and empaneled, appellants filed a joint motion "praying for a severance, and asked that the determination of which one of said defendants should be first tried be determined by the court or State's counsel."   Severance when timely and legally demanded is a matter of right under our law, but this right was given only on named conditions.   Article 727 provides that if severance is desired an affidavit shall be filed, in which the party applying therefor shall state that the evidence of his codefendant is material to his defense, and he verily believes that there is not sufficient evidence against the party whose evidence is desired to secure the conviction of such person.   No such allegations were contained in the request for severance, and under such circumstances there was no error in overruling the application.   In Shaw v. State, 39 Texas Crim. Rep., 161, Judge Hurt says, in speaking for the court:   "The statute requires appellant to state in his affidavit,

as a matter of positive averment, that the testimony of his codefendant will be material to his defense. This was not done." And neither does the affidavit filed in this case so state.

There are bills of exception in the record complaining that the court permitted State's counsel to ask the witness Juan Laerma leading questions. After the witness testified to meeting the appellants in the road and having a conversation with them, the prosecuting attorney asked him, "What if anything did they (the defendants) say they were waiting for?" Witness answered, "He says waiting for a wagon." Counsel objected to the question as leading, when State's counsel replied that under a strict ruling the question might be leading, but the witness had a poor understanding of the English language. The court said under the circumstances he would permit leading questions to be propounded to the witness, and cited as authority for so holding the Jones case. This is a matter within the sound discretion of the trial court, and in the absence of any showing of abuse of this discretion no error is presented. The only reason stated is that there was an interpreter present in court. The court by referring appellant to the Jones case evidenced that he found that it was difficult for the witness to understand the English language, and under such circumstances permitting the State to ask questions of the character and kind above quoted presents no error. It is difficult to conceive that the question would suggest the answer desired. It may be said that it assumed the appellants were waiting for something, but the witness had already testified that he had ridden up to them standing in the road and spoke to them. See collation of authorities cited in Branch's Penal Code, page 90. And when this witness had testified that they said they were waiting for a wagon, and as deceased came driving along, they got in the rear of the wagon, and in a few moments he heard two shots, appellants moved to continue the case, alleging that they were surprised at the testimony of the witness. It is true that the witness admitted that in October, 1915, he had made a statement to appellants' counsel at variance with his testimony on the trial, and had made a statement at that time to counsel for appellants that would tend to support the testimony of appellants, yet it is made apparent by this record that before announcing ready for trial the witness had refused to talk to appellants' counsel, and the counsel had gotten the court to compel the witness to talk to them. That they used Mr. Rohrman as an inerpreter in talking to Laerma, and not only does Laerma testify he told Rohrman what he would testify to, but Rohrman himself testified: "As to whether it is not true that in Judge Love's office, after they brought Juan Laerma there, if he did not start out to tell me something and I said no, it is a lie, I will say that when I saw what he was going to tell I said he was a lie. I knew then he was a witness under the process of this court. With reference to whether I did not know that he was under instructions of this court to talk to counsel and tell what he knew and he started to tell it and I told him

it was a lie, I will state he was telling two different tales. I knew he was brought here by the State as a witness and under the control of this court. I was acting as an interpreter for these gentlemen, defendant's counsel—I was interpreting the statement that he made last fall and he started to make to them through me as interpreter a statement different from that and I told him that was a lie—he was trying to tell what he was going to say here and he was varying from what he told me down in that field and varying from what he told here. I, knowing that he was a witness under the process and control and protection of this court, told him he was lying." Thus it is seen that if appellants' interpreter correctly interpreted to them what Laerma told him, when directed to talk to them by the court, they were made aware of what he would testify, and under such circumstances they can not claim surprise. Again, in the motion, they allege the name of no witness and no fact or circumstance by which they would in the future be more ready to meet this testimony than they were then in condition to meet it. When surprise at the testimony of a witness is relied on as a ground for continuance, the court must be put in possession of some fact or circumstance, where by granting time the person will be enabled to meet or at least minimize the force of the testimony. As no such allegations were contained in the motion made, there was no error in overruling the application. Davis v. State, 60 Texas Crim. Rep., 620; Loveless v. State, 40 Texas Crim. Rep., 221, 44 S. W. Rep., 508; Williams v. State, 48 Texas Crim. Rep., 325.

The appellants objected to the question propounded to John Miller, "I will ask whether at the time they (the defendants) were in your place of business you observed any blood upon either of them," on the ground that it was leading. The setting or testimony accompanying such question is not given in the bill, but if we turn to the statement of facts we find that Mr. Miller had testified that appellants came into his place on Saturday night, and stated they desired to purchase some cheese and crackers; that he got it out for them, when appellant Bonada searched his pockets; that appellant Marta remarked, "Oh, you have got no money." That he was on one side of the counter and they on the other; that the building was lighted with electric lights, and they were not over three feet from him. A leading question is one which may be answered yes or no and which suggests the answer desired. If the question asked does not suggest the answer desired, it is not leading. Coates v. State, 20 Texas Crim. App., 19, and cases cited on page 90, Branch's Penal Code. The question asked could have been answered yes or no, it is true, but it could also have been answered that he did not notice, or half a dozen different ways, and it certainly was not so framed as to suggest to the witness the answer he should give. The fact he answered he did not observe blood on either of them, would not make the question leading. And after Hunter Hill had testified that when appellant was arrested on Sunday morning he had blood on his clothes, hat and shoes, and testified that appellants both

were in Lush Flow's saloon the night before about 9:30 and had purchased beer and cigars that the place was lighted with three lamps, and other facts, to ask him if that blood they found on him Sunday morning was on him Saturday night when he was in the saloon, would not suggest the answer he should give to the question. Kennedy v. State, 19 Texas Crim. App., 618; McGrath v. State, 35 Texas Crim. Rep., 413.

It was not hearsay to permit the witness Laerma to testify that he pointed out to Sheriff Matthews and others the place where he said he saw appellants on the night of the homicide, and where he said appellants got in deceased's wagon. This was a witness testifying to facts within his knowledge and not to facts obtained from any other person. And it was not hearsay to permit Sheriff Matthews and others to testify that at this place was the point where they on the morning after the homicide noticed the wagon began to drag as if the brake had been thrown on. The sheriff was testifying to facts observed by him on the ground. And when the sheriff testified that he followed this "dragged track" to a given point and saw blood along the road until he got to where deceased lay, and there noticed the wheel began to revolve, and that at this point he observed "the first tracks of men, and they looked as if they were men jumping off of something," it would be but a shorthand rendering of the facts. The sheriff went on and testified how the heels dug in the ground and the track slipped, etc. Williams v. State, 60 Texas Crim. Rep., 453; Graham v. State, 28 Texas Crim. App., 582, and cases cited in sec. 132, Branch's Ann. Penal Code. The same may be said as to the testimony of Eugene Barbisch as to the same matter. An opinion, so far as it consists of a statement of an effect produced on the mind becomes primary evidence and admissible whenever the condition of things is such that it can not be reproduced and made palpable in the concrete. Miller v. State, 18 Texas Crim. App., 232; sec. 131, Branch's Ann. Penal Code.

Appellant excepted to the court's charge "for the reason that the court failed to charge the jury that in considering the evidence of Juan Laerma *they should* consider the fact that he had made statements to defendants' attorneys totally at variance with his testimony on the stand, in determining the credibility of said witness and the weight to be given his testimony. Such a charge would have been on the weight to be given certain testimony. The State offered no witness in support of the testimony of the witness. The witness admitted he had made a different statement to counsel for appellants in October, 1915, and his reasons for so doing and his testimony on this trial. The weight to be given the testimony under such circumstances was a matter of argument and not a matter of law to be given in charge to the jury.

The other bills relate to the argument of Hon. John W. Hornsby, of counsel for the State. The first bill shows he said: "These defendants are as guilty as can be; in my opinion the evidence shows that

·these defendants are guilty of having foully assassinated Eugene Smith."
The court promptly instructed the jury not to consider such remarks.
If the evidence for the State presents the correct theory it was a "foul
assassination," the ball entering the head behind the ear, plowing
through his brain. No evidence suggests he was killed otherwise than
by being shot from the rear, and the fact the attorney said it was his
opinion they were guilty presents no reversible error, when the court
instructed the jury not to consider such remark.

In the second bill it is shown "counsel for the State, John W. Hornsby,
alluded to the fact that Rocindo Bonada, one of the defendants, while
on the witness stand, testifying in his own behalf and after the direct
examination and cross-examination had been ·concluded and he had
been excused from the stand by both the State and defense, had stated
to the interpreter that he, Rocindo Bonada, wished to make a further
statement, and that defendants' attorneys had objected to his doing
so, and argued same was a strong circumstance of guilt." The weight
or strength to be given this argument might be a question about which
minds differ, but the bill itself shows that he was commenting on an
occurrence that took place during the trial, and correctly recited it,
and only added, "it was a strong circumstance of guilt." The de-
fendant had placed himself on the stand as a witness, and his testimony
and conduct was a subject of criticism the same as any other witness.
However, the court instructed the jury not to consider the argument.

In the next bill it is shown that "while arguing this cause before the
jury and after the court had charged it, John W. Hornsby, of counsel
for the State, stated to the jury that it was strong evidence of guilt
that when defendants' attorneys had wanted to talk to ·the witness for
the defense that they had declined to do so through the court inter-
preter, but that they, said attorneys, had insisted on taking a private
interpreter for said purpose." Appellants excepted on the ground that
the witnesses referred to were Bonada's wife and defendants themselves.
From the record before us no such grounds of objection were valid, as
in the record we have before us the only witness it shows that appel-
lants' counsel called a private interpreter to communicate with was
Juan Laerma, and this interpreter testified to facts himself that would
authorize counsel to criticise his conduct as shown by the testimony
of the witness Rohrman hereinbefore copied. However, the court
promptly sustained objection to such argument and instructed the jury
not to consider it.

The only other objection to that counsel's argument is that he said
"the law books were full of and that he, Hornsby, had read hundreds
of cases in which convictions had been secured on circumstantial evi-
dence and affirmed by the higher courts in which the evidence was not
nearly so strong as in this case." We suppose this argument was in
reply to the argument of counsel, insisted on in this court, that the
evidence is insufficient to sustain the conviction. This language was

improper; however, the court reprimanded Judge Hornsby for this statement and instructed the jury to disregard it.

It is thus seen that all argument objected to was withdrawn and the jury instructed not to consider it in their deliberations. No written instructions were requested by appellants, and if the reprimand of Judge Fisher given to Judge Hornsby was not in strong enough language to remove any evil effects of the argument made, at the time he instructed the jury not to consider it, certainly appellants ought to have asked such additional instructions as were deemed necessary to remove the evil effects. The argument made is not of that inflammatory character as to authorize a reversal of the case, when the court withdrew it, instructed the jury not to consider it, and reprimanded counsel making the argument in the presence of the jury.

Sufficient of the evidence has been recited as we think to conclusively show such a state of facts as to authorize the jury to return a verdict of guilty. We do not deem it necessary to recapitulate it

The judgment is affirmed

*Affirmed.*

### ON REHEARING.

#### December 27, 1916.

HARPER, JUDGE.—A motion for rehearing was submitted in this cause on last Wednesday, December 20, 1916, and at the same time appellants' counsel also submitted a motion in which they alleged that Judge Harper had ceased to be a member of the court, by reason of the fact that he had formed a partnership with Hudspeth & Dale of El Paso, and had been actually engaged in the practice of law since November 20th.

Were each and every allegation in the motion true, Judge Harper's membership in this court would not be vacated thereby. It is true that article 334 provides that "No judge of the Court of Criminal Appeals shall be allowed to appear and plead as an attorney in any court of record in this State"; and had Judge Harper appeared in any court of record and attempted to plead as an attorney, it would have been improper for him to have done so, but this would not have vacated the office, and doubtless the judge of a court of record in which he attempted to appear and plead would not have permitted him to do so. Judge Harper has appeared and attempted to plead in no court of record and will not do so until his term of office expires. It is true he went to El Paso, contemplating locating in that city, and that he did form a partnership with Hudspeth & Dale while there to engage in the practice of law, and the firm was retained in several cases to be tried after his term of office expires, but while there, neither he nor any member of the firm engaged in the trial of any case in any court of record in which he was interested. It is customary for officials, when retiring from office, a short time before doing so, to form their new

associations, and to make necessary arrangements in regard to their future, and this Judge Harper has done, and nothing more.

In regard to the merits of the motion for a rehearing, we have given it most careful thought and painstaking study. Mr. Eugene Smith, whom the facts show, someone murdered on his road home on the night of October 2d, came to town that day, bringing two bales of cotton and a load of cotton seed. He sold both on that day. It is shown that at least one of appellants, Rocindo Bonada, saw him on his way to the city with the cotton and cotton seed. It is shown that the two appellants were seen together at Richards' saloon in the .City of Austin in the afternoon; that they remained constantly together the remainder of the evening and spent the night together at Gilbert's gin; the State next traced them to Miller's grocery and beer saloon after dark; Mr. Smith being in Miller's place at the time. There Bonado attempted to buy some cheese, but he could not find any money, and appellant Marta remarked to Bonado: "Oh, you have got no money," and Mr. Miller took the cheese back. Both appellants are shown to have been drinking, Bonada apparently more than Marta. Several say Bonada was drunk. They left Miller's. The next place they are traced to by the testimony is the saloon of Lush Flow (known as Hunter Hill's place) on the Webberville road, some three miles from the courthouse. It is shown by the testimony of Lush Flow and Hunter Hill that appellants purchased some beer at this place and two cigars (Cubanola brand); Mr. Flow testifying that appellant Marta was the person who paid for the things purchased. They remained there until the saloon was closed, and they are next traced to White's restaurant and saloon, a little farther on the Webberville road, the way Mr. Smith would go in going home. When they arrived at White's place it is shown to be after 9:30 at night.

At the time Mr. Flow closed his saloon, and appellants left there to go to White's place, Will Eppright testifies he also left the saloon of Mr. Flow, and came towards Austin, and that he met Mr. Smith in a wagon by himself, some four hundred yards this side of the saloon; that Mr. Smith was then driving along slow on his road home. Juan Laerma testifies that he overtook appellants near where the road forks, one going to Webberville and the other fork to Pecan Springs, and held a conversation with them; that while he, Laerma, and appellants were at the forks of the road talking, Mr. Smith came driving along, and appellants climbed in the back of his wagon. Laerma says he galloped on off, and before he got very far he heard two shots. When Mr Smith was found, it was on the side of the road, not a great distance from where those roads forked, and he had been shot twice, one bullet entering just back of and just below the left ear; the other bullet entered the jaw and came out at the right eye. Physicians say either and both wounds were necessarily fatal.

Sheriff Matthews went out that night and brought Mr. Smith to the Seton Infirmary, where he later died. The sheriff and other officers

and citizens went back to the scene of the homicide, arriving there about daylight next morning. Right near the forks of the road the officers say they discovered where the brakes of the wagon had been thrown on; that they could tell this by reason of the wheels dragging, and they followed this dragging wagon wheel to where Mr. Smith was found on the side of the road and saw blood along the road. Beyond the point where Mr. Smith was found, the wagon wheels ceased to drag, evidently the brake having been thrown off. The team and wagon of Mr. Smith was found that night near where the Webberville and Manor roads fork with their heads turned towards Manor. The officers say the next morning they followed this wagon track from where Mr. Smith lay to a point on the Webberville road where this team turned into the Manor road, and they saw the tracks of two persons, having the appearance of having jumped, describing the track where it hit the ground, and the way it slided. From this point they say they followed the tracks of these two men to Gilbert's gin, and there they found one whole Cubanola cigar and the stub of another. At the gin the tracks separated, and a portion of the men followed one set of tracks and the other men followed the other set of tracks. Those who followed the set of tracks leading towards Littlepage's store found appellant Rocindo Bonada at this store, apparently buying some confections for his breakfast. They arrested and searched him and found on him a $5 bill and some silver, and blood was found on his clothing—on his hat, on his shirt, on his pants and on his shoes, and some under his finger nails  Those who followed the other track from Gilbert's gin, traced appellant Juan Marta and arrested him. Mr. Geo. Gilbert testified he thought there was blood on both trousers legs, and Woody Gilbert says there was blood on appellant Marta's collar—a bright red spot.

After the State had made its case by the above facts and circumstances, both appellants took the witness stand; they both admitted they were in Austin on that day, and in places the State had placed them; they both admitted they were at Miller's, and Bonada attempted to buy cheese and could find no money on his person, and that Marta remarked to him he had no money; they both admit they were at Lush Flow's saloon and bought the two cigars, they claiming though that Bonada had found his money and paid for the drinks, while Lush Flow says Marta paid for them; they admit they were at White's saloon and restaurant, and shortly after leaving there they met Laerma in the road and talked to him, but deny most emphatically they got in Mr. Smith's wagon or that he came along; they admit going down this road, but they say it was after Mr. Smith had been shot and was lying on the side of the road, and they saw the body as they passed down the road; they admit they went down this road and went to Gilbert's gin and spent the night there, and the cigars that were found there were the ones they had purchased the night before at Flow's. They admit they separated there and traveled the road from which

they were traced the next morning to the point where they were arrested. So the only material difference in this portion of the testimony is, did Smith come along as testified to by Laerma and appellants got in his wagon while he was alive and well, and were two shots fired thereafter, or did Laerma meet them after Smith had passed this point and they traveled down the road after Smith had been shot, as they testified.

Appellant Bonada admits he had blood on his clothing as testified to by the officers when arrested next morning, but says his nose had bled while he was in Austin the evening before, and this caused the blood to be on his clothing and hands. He admits he tried to buy the cheese at Miller's the night before and could not find his money, and admits he had a five dollar bill and some silver on his person when arrested; he testifies he was drunk when in Miller's place of business and his money was in an inside pocket, and he offers testimony that he was paid some money by Charles Bernard on the day he was in Austin.

Juan Marta denies he had any blood on his clothing, as testified to by State's witnesses, and he had his pants examined by Dr. Graham, who applied tests, and testifies there was no blood on Marta's trousers, but the collar testified to by Woody Gilbert as having a "bright red spot of blood on it" was not carried to the physician for examination.

Thus it is seen that while the testimony offered by appellants would tend to explain many of the incriminating circumstances, yet the jury was not bound to accept their explanation as true, and evidently did not do so, and if there is any credence to be placed in the testimony of Juan Laerma, and the testimony of the officers as to the wagon tracks, and then the tracks of appellants to Gilbert's gin and then to the point where they were arrested, it is not surprising they did not do so; at least this court would not be authorized to disturb the verdict on that account.

Appellants again insist there was error committed on account of refusing to grant a continuance on account of the absence of witness Eugenio Rios, and we were in error in holding that no sufficient diligence was shown. The indictment was returned against appellants on December 24, 1915; the case was not tried until March 6, 1916. No subpoena was issued for the witness Rios until February 22, and it was returned "Witness not found" on March 4, 1916. No additional process was applied for or issued for the witness. In regard to this witness, appellants state in their motion: "The witness Eugenio Rios was a resident of Travis County during the fall of 1915, and so far as these defendants have been able to ascertain is still a resident of the county. In this connection defendants would show that while their application for a subpoena was for Eugenio Rios, the subpoena issued for Eugenio Reyes; that there were Mexicans residing in Travis County and also in Bexar County by the name of Rios, and defendants believe by the next term of court they will be able to locate Eugenio Rios." This motion was overruled on March 6th. The motion for a new trial

was not heard until April 8th—a month later—and in this motion appellants show they had still been unable to locate this witness. Under such circumstances there was no sufficient diligence, for in it neither the application for a continuance, nor in the motion for a new trial is it shown appellants knew the location of the witness, nor could they hold out to the court more than a vague and indefinite promise that they might be able to locate him. In addition thereto all appellants state they expect to prove by the witness is that he says the witness would testify "that about 5 o'clock in the afternoon he saw appellant Bonado come out of a saloon on East Sixth Street, and that said appellant was intoxicated, and his nose was bleeding and dripping on his clothing, and he (witness) loaned said appellant a red bandanna handkerchief to be used by said appellant to prevent blood from dropping on his clothing." The State shows by Mr. Miller that appellant Bonada was at his saloon at a later hour, and there was then no blood on his clothing; the State shows by Hunter Hill and Lush Flow that both appellants were at Flow's saloon at 9:30 the night of the homicide, and the witnesses testify there was then no blood on Bonada's clothing; the State shows that after 9:30 at night and just a short time prior to the homicide appellants were at Dick White's saloon and restaurant, and White says appellants then had no blood on their clothing. Will Eppright testifies he saw both appellants at Dick White's, and that he danced with Juan Marta, and that he saw no blood on the clothing of either of them. The next morning when the officers arrested appellant Bonada he had blood on his hat, shirt, trousers, shoes and under his finger nails; they took a red bandanna handkerchief off of him, and they each and all swear it had no blood on it. So he did not use a red handkerchief furnished him by Rios to "prevent blood from dripping on his clothing." A white handkerchief was also found on his person, and it had no blood on it. Under such circumstances no one can say that such testimony would have materially changed the result, and the rule in this court has always been that it is only in case where from the evidence adduced on the trial, the court is impressed with the conviction, not merely that the defendant might possibly have been prejudiced by such ruling, but that it was reasonable probably that if the absent testimony had been before the jury, a verdict more favorable to the defendant would have resulted. Covey v. State, 23 Texas Crim. App., 388; Gaines v. State, 67 Texas Crim. Rep., 604, 150 S. W. Rep., 199; Hart v. State, 61 Texas Crim. Rep., 509; Lane v. State, 59 Texas Crim. Rep., 595; Boyd v. State, 57 Texas Crim. Rep., 647; Land v. State, 34 Texas Crim. Rep., 330.

The next contention is, we erred in holding that there was no error in overruling the application for severance. We fully appreciate and recognize that a severance is a matter of right in this State, when properly and seasonably applied for. In this case, however, it is made apparent by the bill of exceptions that when the case was called for trial, no request for a severance was made. When the application for

a continuance was overruled, the special venire was called, a portion
of the jury had been selected and sworn, and appellants had exhausted
eleven of their fifteen challenges, a request was made for severance.
Certainly at that time the severance was not a matter of right. (Hooper
v. State, 72 Texas Crim. Rep., 82, 160 S. W. Rep., 1187; Burton v.
State, 65 Texas Crim. Rep., 578, 146 S. W. Rep., 186; Crawford v.
State, 74 S. W. Rep., 552.) And at most, under the facts of this
case,—a portion of the jury being empaneled,—it was a matter ad-
dressed to the sound discretion of the court, and we can not say the
court abused the discretion confided by law to him. The State traced
them together from the time they left town, until after Mr. Smith
was assaulted, and according to its evidence placed them both in his
wagon just before the homicide. The defendants' both testify and both
admit they were together from the time they left Austin until next
morning, although they deny getting in Smith's wagon. One had no
defense, according to the record before us, that was not a defense for
the other. The request for severance coming as it did, after announce-
ment of ready for trial, the partial selection of the jury, and the
exhausting of eleven of the fifteen challenges allowed by law, came too
late to make it a matter of right.

In a number of other bills they complain of what appellants term
leading questions. They do not claim that any of the testimony ad-
duced by such questions was inadmissible, but only it was elicited by
leading questions. Appellants seem to labor under the impression that
the court must have qualified each bill and stated why he permitted
the questions to be asked that are complained of. Such has never been
the rule in this State, but, on the contrary, as stated by Mr. Branch
in his Penal Code, section 159, the rule is: "A bill of exceptions
taken because of leading questions *must affirmatively exclude the idea*
that under the peculiar circumstances of the particular case the court
was justified in permitting the State to ask leading questions, and
*if it does not do so,* no error is shown," citing Montgomery v. State,
4 Texas Crim. App., 140; Henderson v. State, 5 Texas Crim. App.,
134; Harris v. State, 37 Texas Crim. Rep., 441; Payner v. State, 40
Texas Crim. Rep., 640, 47 S. W. Rep., 977; Hamilton v. State, 41
Texas Crim. Rep., 599; Carter v. State, 59 Texas Crim. Rep., 73, and
a number of other cases. Measured by this standard, each and every
one of appellants' bills are insufficient to present the questions for
review. As illustrative of the bills, we will copy the first one in the
record on this question:

"Be it remembered that on the trial of the above styled and num-
bered cause in this court while the State's witness John Miller, a wit-
ness for the State, was on the witness stand, he was interrogated on
his direct examination by Judge Linden, counsel for the State, as
follows:

"I will ask whether at the time they, the defendants, were in your
place of business you observed any blood upon either of them? To

which question defendants objected on the ground that same was lead-
ing, which objection was by the court overruled and said witness stated
that he had not observed any blood upon either of the defendants, to
which action of the court in permitting said question and answer, the
defendants excepted and herewith tender their bill of exceptions No. 3
and ask that the same may be signed and made a part of the record in
said case, which is accordingly so done."

This is as full and complete as any on this question, and we could
have passed them out on this ground, but rather than do so, we took
the record and demonstrated, in our opinion, there was no error in
the ruling of the court, had the matters been properly presented. This
witness' testimony shows he testified there were electric lights in his
place of business, and the appellants were just across a counter from
him, only two and one-half feet. That appellant Bonada had sought
to purchase cheese, and searched his clothing to find money to pay for
it, and failed to find any; that appellant Marta remarked, "Oh, you
have no money," when he, witness, took the cheese and placed it back
on the shelf, and he was then asked, "whether at the time they, the
defendants, were in your place of business you discovered any blood
on them?" Under such circumstances this was not an improper ques-
tion, and there was no error in permitting the witness to answer, "I
did not observe any blood on either of them."

We could take each bill complaining of leading questions and demon-
strate its incompleteness to present any error, and take the facts as
shown by the record and demonstrate that under the peculiar circum-
stances the questions were not improper, and elicited no improper
answer, but as the bills relating to this matter are in the form of the
above bill, we do not deem it necessary to do so more extensively than
we did in the original opinion.

As shown in the original opinion, appellants had several bills com-
plaining of the remarks of the Hon. John W. Hornsby, who assisted
in the prosecution. The bills themselves show that in each instance
appellants' exceptions were sustained, and the jury instructed not to
consider such remarks, and in some of the bills it is stated "the court
reprimanded Mr. Hornsby." The remarks complained of are set forth
in the original opinion, and we do not deem it necessary to do so again.
Appellant during the trial asked no further or different instructions,
and in the absence of requested instructions the rule is, the remarks
must have been highly inflammatory and prejudicial, or the court's
action in withdrawing the remarks and instructing the jury not to
consider them, in the absence of any request for written instructions,
will be deemed sufficient. In Davis v. State, 54 Texas Crim. Rep.,
236, is discussed at length the question of when argument of counsel
will be ground for reversal, although no written instructions were
requested, and the writer would not be understood as varying from the
rule as there announced; but in that case no instructions not to con-
sider the remarks were given, while in this case they were given by

the court, without written instructions being requested and counsel reprimanded, and in addition thereto the court embodied in his general charge the following:

"Neither counsel for the State, nor defendants' counsel, have any right to refer to or discuss any fact or circumstance not in evidence, or to in any way appeal to you except from the testimony in evidence and the law as given you in the charge of the court, and you must not consider or in any way be influenced by any remark or the discussion of any fact by the counsel for the State, or defendants' counsel, when such fact or circumstance is not in evidence." Under such circumstances these bills present no error. Miller v. State, 79 Texas Crim. Rep., 9, 185 S. W. Rep., 29.

The only other matter complained of which we deem necessary to notice, is the contention that appellants should have been granted a postponement after Juan Laerma had testified. As shown in the original opinion, appellants' counsel could not have been surprised at that testimony when given by the witness. They had been put on notice by the witness, and the court instructed the witness to talk to them, and he went to their office to do so, and when Laerma went to tell their interpreter what he would testify to, their interpreter denounced him as a liar, etc. We take the following excerpts from Mr. Branch's Penal Code, section 340:

"An application for continuance made to secure the testimony of an absent witness on account of surprise during the trial is defective if it fails to state that there was no reasonable expectation of procuring the attendance of such witness during the present term of the court by a postponement of the trial to a future day thereof. Sweeney v. State, 59 Texas Crim. Rep., 370, 128 S. W. Rep., 390.

"A bill of exceptions taken to the refusal to continue or postpone because of surprise during the trial is defective if it fails to show what defendant expected to prove by the absent witness. Davis v. State, 60 Texas Crim. Rep., 620, 132 S. W. Rep., 932.

"Defendant is not entitled to a continuance on the ground of surprise when the surprise was caused by his own carelessness and neglect. Evans v. State, 13 Texas Crim. App., 225."

In the application for postponement appellants state the name of no witness; ask for process for no witness, and by their allegations demonstrate they have knowledge of no witness who would contradict the testimony of the witness Laerma other than those in attendance on court. The most that can be said, they requested that they be granted time to go upon a "fishing expedition" to see if they could not find some testimony not theretofore known to them.

The motion for rehearing is overruled.

*Overruled.*

PRENDERGAST, PRESIDING JUDGE.—I concur in the whole opinion.

DAVIDSON, Judge (dissenting).—I am of opinion that the rehearing ought to be granted: (1) On continuance; (2) on request for severance. I do not care to write at any length.

I believe from hurried review of the motion of appellants to disqualify Judge Harper from sitting in this motion for rehearing that as a member of this court I am not authorized to decide that matter. Any conclusion I might reach or decide I could not enforce by judicial order or mandate. This court as a court can not try one of its members for breach of duty, or supposed breach of duty.

March 28, 1917.

PRENDERGAST, Judge.—This cause was affirmed November 15, 1916, on which date the original opinion was handed down. Within fifteen days appellants made a motion for a rehearing, which was heard in due order. At that time appellants also made a motion alleging that Judge Harper, then one of the judges of this court, had formed a a partnership for the practice of law at El Paso and had since November 20th actually engaged in the practice of law in courts of record there, and thereby vacated the office of judge of this court. This court considered that matter at the time with a full court, then composed of Judges Davidson, Harper and this writer. This court by its order of December 27th overruled said motions and handed down its opinion on the same day. On December 29th the mandate from this to the lower court was duly issued and sent to the proper officer of the lower court. Judge Harper's term of office expired December 31st. Judge Morrow succeeded him and took the oath of office the next day, January 1, 1917.

Some days later appellants placed in the hands of the members of this court another motion, and argument and brief thereon, attacking the judgment and opinion of this court overruling their motion for a rehearing, on substantially the grounds they had before alleged, to the effect that Judge Harper had vacated and abandoned the office of judge of this court on and after November 20th because he had formed the said law partnership and engaged in the practice of law in the courts of record of this State and had a pecuniary interest in this cause in that he would get his salary as judge of this court up to the · termination of his term of office on December 31, 1916, and seek thereby to have this court as now constituted reopen said cause, hold that Judge Harper had vacated and abandoned his office and had a pecuniary interest in this cause, which disqualified him to act therein at the time this court overruled their motion for a rehearing.

Each member of this court has investigated the questions thus sought to be raised, and after mature deliberation has reached the conclusion that none of appellants' contentions ought or can be sustained. We all deem it unnecessary to go into an elaborate discussion of the ques-

tion or citation of authorities to any extent, but content ourselves with stating our conclusions.

We decline to permit appellants to file the papers above mentioned, which have been in our hands as stated, seeking to reopen the final judgment rendered herein, on the following grounds: (1) Because they present no constitutional or statutory grounds of disqualification of Judge Harper even if all of the allegations were admitted to be true, nor do they show an abandonment of the office by Judge Harper so as to have created any vacancy. (2) Because they are a collateral attack upon the title of Judge Harper to said judicial office. (3) Because they show that Judge Harper was in fact a *de facto* judge of this court even if he could not be held at the time to be a *de jure* judge thereof.

It is well settled by the courts of this and other States that the title of an incumbent to a judicial office can not legally be questioned in a collateral proceeding, as the said attack is of Judge Harper's office. Ex parte Call, 2 Texas Crim. App., 497; Hamilton v. State, 51 S. W. Rep., 217; State v. Brown, 12 Minn., 538; Plymouth v. Painter, 17 Conn., 585; Carlton v. People, 10 Mich., 250; Brown v. Lunt, 37 Me., 423; State v. Miller, 5 Wis., 308; Com. v. Fowler, 10 Mass., 290; State v. Williams, 35 La. Ann., 742; Ex parte Strahl, 16 Ia., 369; Curtin v. Barton, 139 N. Y., 505; State v. Miller, 20 S. W. Rep., 243; Cooper v. Moore, 44 Miss., 386; Rogers v. Beauchamp, 10 Ind., 33; Ball v. United States, 140 U. S., 118; Manning v. Weeks, 139 U. S., 504.

Even if it be conceded that Judge Harper engaged in the practice of law as claimed, he did not thereby vacate nor abandon his office, as has been expressly held by the Supreme Court of Missouri in State, ex rel. Attorney General, v. Seay, 64 Mo., 97.

There is no question but that as a matter of fact, as the records and minutes of this court show, and of which we have unquestionable judicial knowledge, Judge Harper continued up to the time his term of office expired, as stated, to exercise the functions of a judge of this court under his commission and was unquestionably a judge of this court *de facto,* and all of his actions as such were valid with reference to the public and third persons and appellants herein. "We would not be understood, however, as holding that he was not a *de jure* officer." (Hamilton v. State, 40 Texas Crim. Rep., 464, 51 S. W. Rep., 217); State v. Cowl, 38 Conn., 449; Pringle v. State, 67 So. Rep., 455; Woodside v. Wagg, 71 Me., 207; Throop, sec. 631, p. 597.

Therefore, the clerk of this court is hereby directed and required to enter an order to the effect that this court and the judges thereof decline and refuse to permit appellants to file said documents in this court.

*Overruled.*